756 N.W.2d 641 (2008)
2008 WI App 115
The NATURE CONSERVANCY OF WISCONSIN, INC., Plaintiff-Respondent,
v.
Ronald L. ALTNAU, Defendant-Appellant,
Eileen E. Hunzinger, Eugene F. McEssey And Marion L. McEssey, Defendants.
No. 2007AP1752.
Court of Appeals of Wisconsin.
Submitted on Briefs April 22, 2008.
Opinion Filed June 18, 2008.
*643 On behalf of the defendant-appellant, the cause was submitted on the briefs of William H. Gergen of Gergen, Gergen & Pretto, S.C., Beaver Dam.
On behalf of the plaintiff-respondent, the cause was submitted on the brief of Thomas L. Shriner, Jr., and Leon W. Todd III of Foley & Lardner LLP, Milwaukee.
Before BROWN, C.J., ANDERSON, P.J., and SNYDER, J.
¶ 1 BROWN, J.
This appeal concerns a real property agreement entered into in 1967. This agreement gave a right of first refusal on one property to owners of adjoining properties and stated that this right belonged to these property owners and their "heirs, successors and assigns." The key issue in this case is whether this right of first refusal could be transferred to just anybody or whether it could only be transferred along with one of the adjoining properties. The appellant, Ronald L. Altnau, claims that he holds the right of first refusal, having received it by "assignment" from one of the owners of the adjoining properties. He asserts that the word "assigns" in the 1967 agreement therefore includes him. But the circuit court held, and we agree, that the law is as follows: in the absence of clear language stating otherwise, the right runs with the land, unless it would be more useful to the original grantee than to one who later owned the land. Contrary to Altnau's argument, the use of the word "assigns" in the agreement does not constitute such a clear statement; and he has given no reason to think that the right is more valuable to him than to the owners of the adjoining property. We therefore affirm the trial court and hold that the right of first refusal runs with the land.
¶ 2 All of the land involved in this litigation was once a single property owned by Dwight and Laura Clausen. In 1967, the Clausens carved out three parcels of the property and sold them to three different buyers, while retaining some of the original property themselves. The sale agreement described the parcels to be transferred to each of the buyers and price to be paid for each, established an easement for access to the three parcels, and delegated responsibility for maintaining this easement. The agreement also contained a clause entitled "Hunting Privileges" which read in pertinent part:
The grantors hereby grant to the grantees and all of them, their respective heirs, successors and assigns, the right to hunt, fish, etc. on all lands of the grantors.... Provided, however, that in the event the grantors shall sell any portion of said lands under which the hunting rights are herein granted, then and in such event, said hunting rights shall terminate forthwith on the portion so sold. Provided further, however, that the grantors hereby give and grant to the first, second and third grantees, their heirs, successors and assigns, an option to purchase any or all of said land which may be offered for sale by the grantors at a purchase price equal to the highest bonafide offer received by said grantors. Upon receipt of a bonafide offer of purchase acceptable to the grantors, the grantors shall give written notice by registered mail to the grantees herein and the grantees shall have ten (10) days from receipt of said notice to notify the grantors of their election to exercise the option herein granted....
This agreement shall be binding upon the heirs, successors or assigns of the parties hereto.
¶ 3 The Clausens held the property that they had retained until 1988, when they *644 transferred it to George Curtis, who in turn transferred it to the Nature Conservancy.
¶ 4 Eugene and Marion McEssey were the original purchasers of one of the three parcels via the 1967 agreement. In 2003, the McEsseys executed and recorded a document titled "Assignment" by which they "assign[ed] to Ronald L. Altnau all option to purchase rights[1] and privileges previously granted to Mr. & Mrs. McEssey by means of [the 1967 agreement]." The McEsseys did not sell their parcel to Altnau, and as of the date of the circuit court's judgment in this case they apparently still owned it.
¶ 5 In 2005, the Nature Conservancy, apparently wishing to transfer its parcel to the Department of Natural Resources, brought an action to quiet title against the owners of two of the three parcels, and also against Altnau. In addition to attacking the continuing validity of the parcel owners' right of first refusal, it claimed that Altnau's purported acquisition of the right from the McEsseys was invalid, because the right runs with the parcel still owned by the McEsseys. As such, it sought to have Altnau dismissed from the litigation. The circuit court agreed with the Nature Conservancy, and granted summary judgment dismissing Altnau from the action.[2] Altnau appeals.
¶ 6 Whether the 1967 agreement created a right of first refusal running with the land or freely transferable to non-owners of the adjoining property is a question of contract interpretation. In interpreting a contract, courts attempt to give effect to the meaning intended by the contracting parties. Seitzinger v. Community Health Network, 2004 WI 28, ¶ 22, 270 Wis.2d 1, 676 N.W.2d 426. If a court finds one clear and unambiguous meaning in contractual language, the court will apply that language as written. Yee v. Giuffre, 176 Wis.2d 189, 192-93, 499 N.W.2d 926 (Ct. App.1993). However, where contractual language is reasonably susceptible to more than one meaning, that language is ambiguous. Id. at 193, 499 N.W.2d 926. Courts may look to extrinsic evidence in ascertaining the intent of the parties to an ambiguous contract. See RTE Corp. v. Maryland Cas. Co., 74 Wis.2d 614, 621, 247 N.W.2d 171 (1976). Interpretation of a contract by resort to extrinsic evidence presents a question of fact. However, where, as here, no extrinsic evidence bears on the meaning of the contract, only a question of law is presented, and thus this court's review is de novo. See id.
¶ 7 The parties tacitly agree that the right of first refusal created by the 1967 agreement is a servitude: a legal device that creates a right or obligation that runs either with land or with an interest in land. See RESTATEMENT (THIRD) OF PROP.: SERVITUDES § 1.1(1) (2000). The burden of the first refusal right lays with the land retained by the Clausens in the 1967 agreement and now held by the Nature Conservancy. See id. § 1.1(c). This dispute between the parties is about the nature of the benefit of this right. See id. § 1.1(b). The benefit, like the burden, of a servitude may be one of two kinds: in gross or appurtenant. A benefit is appurtenant if the right to enjoy that benefit is tied to the ownership of a particular parcel of land. Id. § 1.5(1). A benefit is in gross if it is not appurtenant; that is, if the *645 benefit may be held without regard to whether one owns any particular land. Id. § 1.5(2). Whether a benefit is appurtenant or in gross, it may also be personal; a personal benefit is one that may not be transferred and does not run with the land. Id. § 1.5(3).
¶ 8 Both parties agree that the benefit of the first-refusal right is not personal. The agreement makes this much clear by specifying that the right belongs not only to the "grantees" but to their "heirs, successors, and assigns." What is in dispute is how the right may be transferred. Altnau claims that the right of first refusal is a right in gross, and may be transferred by the original purchasers of the three parcels to anyone they choose, without regard to the ownership of the parcels. The Nature Conservancy argues, to the contrary, that the right of first refusal is appurtenant to the land held by the McEsseys, and may only be transferred by the transfer of their parcel.[3]
¶ 9 As we have said, the 1967 agreement does not contain the words "in gross" or "appurtenant." Altnau nevertheless contends that it unambiguously makes the right of first refusal a right in gross. He contends that the word "assigns," as used in the agreement, is dispositive. He notes that "assign," when used as a noun, means "assignee." WEBSTER'S THIRD NEW INT'L DICTIONARY 132 (Unabr. ed. 1993). He argues that therefore, the clause giving the right of first refusal to the grantees and their "assigns" means that the grantees may assign the right of first refusal. This, according to Altnau, flows from the "usual and ordinary meaning" of the noun "assigns" and its use in the agreement. According to Altnau, "[i]f this Court finds that the word `assigns' means what it says, and finds that ... the contract used that word in specific conjunction with the right of first refusal language, then this Court need not resort to other interpretive rules at all."
¶ 10 This argument has flaws. For one thing, as the Nature Conservancy notes, the issue in this case is not whether the right may be assigned, but how it may be assigned. It is no contradiction to say that the right of first refusal is assignable, and also to say that it runs with the land. If the right is appurtenant, and bundled with the three parcels sold in the 1967 agreement, it may still be assigned; it simply must be assigned along with one of the parcels.
¶ 11 For another, despite its presence in Webster's, we doubt that the word "assigns," used as a noun, really has a "usual and ordinary meaning" in the sense of a non-legalese common understanding. It seems to us that we seldom hear anyone speak of someone being someone else's "assign" outside of the legal context. The Webster's definition simply points to the definition of "assignee," which is itself defined with respect to various legal concepts. Id. Further, every time the word is used in the 1967 agreement, it is used as part of the same four-word phrase: "heirs, successors and assigns" ("or" is substituted for "and" in one instance). It has the ring of an oft-repeated formula.
¶ 12 And it turns out to be just that. The phrase "heirs, successors and assigns" appears thousands of times in reported *646 cases. Cases about easements and other servitudes are replete with the phrase, and with variants like "successors and assigns" and "heirs and assigns." Further, it appears that the word "assigns" has an impressive pedigree in the history of litigation over servitudes. Its absence from a covenant was a crucial issue in Spencer's Case, reported in 1583. Morris J. Galen, Note, Spencer's CaseCovenants Running with the LandThe Requirement that the Word "Assigns" Be Used, 28 Or. L. Rev. 180, 180-81 (1949). The specific rule derived from this case was that certain covenants respecting real estate could not run with the land unless they expressly referred to "assigns." Id. While this ancient rule does not govern our case, from our survey of (much) more recent cases, it appears frequently that when a right or interest is given to a party and to that party's "assigns," this is taken to mean that the right is to be appurtenant to the land involved, and not, as Altnau claims here, a right held in gross. See, e.g., Canyon Meadows Home Owners Ass'n v. Wasatch Co., 40 P.3d 1148, 1153 (Utah App.2001) ("the terms `successors' and `assigns' have long been used to create easements that run with the land"); Corbett v. Ruben, 223 Va. 468, 290 S.E.2d 847, 850 (1982) (rejecting notion that an easement could not be appurtenant unless the grantor specifically included "heirs, successors and assigns" but noting that "such words are `language which strongly tends to preclude the idea of an easement in gross.'").
¶ 13 We hasten to say that the use of a particular word or phrase as a term of art in case law will not necessarily dictate its meaning in a particular document. Altnau is correct that the ultimate goal in construing this agreement, as in construing other contracts, is to determine by the words of the contract what the contracting parties intended. In some cases applying technical or precedential meanings to contract terms may defeat the will of the parties. Jones v. Jenkins, 88 Wis.2d 712, 723, 277 N.W.2d 815 (1979) ("[T]he construction or meaning intended to be conveyed by the words of a writing is seldom aided by argument or precedents. The one charged with the duty of construction must assume that parties intended to express that which the words used convey to his mind." (Citation omitted.)). But the contract here is a real estate contract drafted by an attorney. The drafter created a right and specified that the right belonged to the purchasers and their "heirs, successors an assigns"; a phrase which, before and after 1967, was construed in abundant cases as creating an appurtenant servitude. In view of these facts, we find it impossible to accept Altnau's proposition that the agreement's use of the word "assigns," in and of itself, dictates that the right of first refusal is instead one in gross.
¶ 14 We therefore conclude that the 1967 agreement contains no clear and unambiguous statement that the right of first refusal is either in gross or appurtenant to the transferred parcels. We also note that our research into Wisconsin case law has not turned up any particular rules or test to guide us in determining whether an ambiguous writing creates an in gross or appurtenant servitude.[4] However, the RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES (2000) does provide a test. Both parties have argued according to the RESTATEMENT (THIRD) approach, and we find the rules it sets forth reasonable and helpful. We therefore adopt them here.
*647 ¶ 15 The overarching principle for the interpretation of servitudes is given in § 4.1: "A servitude should be interpreted to give effect to the intention of the parties ascertained from the language used in the instrument, or the circumstances surrounding creation of the servitude, and to carry out the purpose for which it was created." Id. § 4.1. Section 4.5 contains more specific rules for determining whether a servitude benefit is appurtenant or in gross. It reads in pertinent part:
(1) Except where application of the rules stated in § 4.1 leads to a different result, the benefit of a servitude is:
(a) appurtenant to an interest in property if it serves a purpose that would be more useful to a successor to a property interest held by the original beneficiary of the servitude at the time the servitude was created than it would be to the original beneficiary after transfer of that interest to a successor;
(b) in gross if created in a person who held no property that benefited from the servitude, or if it serves a purpose that would be more useful to the original beneficiary than it would be to a successor to an interest in property held by the original beneficiary at the time the servitude was created;
....
(2) In cases of doubt, a benefit should be construed to be appurtenant rather than in gross.
Id. § 4.5
¶ 16 So, the RESTATEMENT (THIRD) system is this: we first look to the language of the instrument, the circumstances surrounding the creation of the servitude, and the purpose for which it was created. Of course, this first step roughly comports with what Wisconsin courts do with all written agreements. But if the language and surrounding circumstances (and any extrinsic evidence) fail to yield a clear answer as to whether a servitude's benefit is in gross or appurtenant, the RESTATEMENT (THIRD) provides a way of resolving the question: we ask whether the benefit would be of more use to someone holding the property interest held by the original beneficiary of the servitude, or, instead, of more use to that original beneficiary than to someone else holding the original beneficiary's property interest. Where this inquiry does not yield a clear answer, we construe the benefit as appurtenant.
¶ 17 Altnau urges that we need go no further than § 4.1, because the language of the agreement clearly specifies that the right of first refusal is a right in gross. In addition to his argument, which we have rejected, that the word "assigns" in and of itself is dispositive, he argues that the location of the phrase "heirs, successors and assigns" within the agreement clearly demonstrates an intent that the benefit of the right of first refusal be in gross rather than appurtenant. The phrase appears in the final section of the agreement, the one entitled "Hunting Privileges" and providing both hunting rights and the right of first refusal. Because the phrase "heirs, successors and assigns" does not appear anywhere else, particularly in those portions of the agreement transferring the parcels of land at issue, there is no reason, according to Altnau, to imagine that the hunting rights, or the right of first refusal, were intended to be tied to the land. In Altnau's words, "the hunting privileges described in the first part of that sub-section are assignable and, further, the option to purchase is similarly, and separately, assignable."
¶ 18 In our view, the location of the phrase "heirs, successors and assigns" does not do much to support Altnau's position. It is true that the phrase appears in the "Hunting Privileges" section of the agreement, where it is applied both to the *648 hunting rights and to the right of first refusal contained in that section. However, contrary to Altnau's claim, the phrase appears elsewhere in the agreement. It is used in the section which allocates responsibility for maintaining the easement whose benefit everyone agrees is appurtenant to the land. And though "Hunting Privileges" is the last heading in the document, on the last page of the document there is a paragraph break (something not found within any of the sections of the agreement) and a final sentence right above the signature block: "This agreement shall be binding upon the heirs, successors or assigns of the parties hereto." It is at least arguable that this sentence is meant to apply to the entire document.
¶ 19 Further, looking at the right of first refusal in the context of the agreement as a whole, we find more support for the Nature Conservancy's argument that the right of first refusal is appurtenant. At the time of the agreement, in 1967, the purchasers of the three parcels each received some land, an easement for access, and hunting rights on the adjoining land still held by the original owners, the Clausens. Such hunting rights strike us as most beneficial to the owners (and presumably occupiers) of the contiguous properties. The Clausens, in order to retain the ability to sell their land when they wished, and recognizing that a potential purchaser might be harder to find if others were entitled to hunt on the land, specified that hunting rights would cease upon sale. However, they gave to the purchasers of the three parcels the right of first refusal. That way, the purchasers could retain their hunting rights on the Clausens' property by purchasing it outright, at whatever price the Clausens might otherwise obtain from an outside purchaser.
¶ 20 We find this reading, in which the hunting right and first-refusal right are connected to one another and to ownership of the adjoining parcels, to make far more sense than Altnau's interpretation. For one thing, if the two rights are "separately assignable" as Altnau claims, it is difficult to understand why the first-refusal right is contained in the section of the agreement entitled "Hunting Privileges." For another, it does not seem likely that the 1967 agreement, which is at its heart a land sale, was also intended to create hunting rights and first-refusal rights freely transferable to any stranger without regard to whether that stranger had any interest in the contiguous properties.
¶ 21 We would not go so far as to say that the context of the 1967 agreement definitively shows that the right of first refusal was intended to run with the land. There is no express statement on the issue, and the context and purpose of the agreement, though suggestive of an appurtenant right, do not provide an airtight answer. However, applying the RESTATEMENT (THIRD) approach, we note that the right of first refusal is particularly beneficial to a party owning one of the contiguous parcels, giving such an owner the option to preserve his or her hunting rights in the adjoining land. See id. § 4.5(1)(a). Even if this does not banish all doubt from our minds, the RESTATEMENT (THIRD) directs us to resolve such doubt in favor of an appurtenant servitude. See id. § 4.5(2). Because the right of first refusal is appurtenant to land not owned by Altnau, he does not hold the right and the circuit court properly dismissed him from the case.
Judgment affirmed.
NOTES
[1] Though both the 1967 Agreement and the 2003 Assignment speak of an "option to purchase," both parties appear to agree that the right described is more accurately called a "right of first refusal."
[2] The action is still pending in the circuit court with respect to the remaining parties.
[3] Altnau begins his argument by citing to several sources distinguishing personal rights from those which are assignable. See, e.g. Jonathan F. Mitchell, Can a Right of First Refusal be Assigned?, 68 U. Chi. L. Rev. 985 (2001). These authorities are not particularly germane, because this case is not about whether the right of first refusal in the 1967 agreement is assignable (i.e., transferable as opposed to personal), but rather about whether it is in gross or appurtenant.
[4] But see Kallas v. B & G Realty, 169 Wis.2d 412, 415, 485 N.W.2d 278 (Ct.App. 1992) (discussing the differences between in gross and appurtenant easements and citing the RESTATEMENT OF PROPERTY in a case where an appurtenant easement was expressly conveyed).