# COURT OF APPEALS OF WISCONSIN
## PUBLISHED OPINION

Case No.: 2018AP960

†Petition for Review Filed

Complete Title of Case:

COUNTRY VISIONS COOPERATIVE,

PLAINTIFF-APPELLANT-CROSS-RESPONDENT,†

V.

ARCHER-DANIELS-MIDLAND COMPANY AND UNITED COOPERATIVE,

DEFENDANTS-RESPONDENTS-CROSS-APPELLANTS.

| | |
|---|---|
| Opinion Filed: | May 6, 2020 |
| Submitted on Briefs: | November 14, 2019 |

| | |
|---|---|
| JUDGES: | Neubauer, C.J., Gundrum and Davis, JJ. |
| Concurred: | |
| Dissented: | |

| | |
|---|---|
| Appellant ATTORNEYS: | On behalf of the plaintiff-appellant-cross-respondent, the cause was submitted on the briefs of *David G. Peterson, J. Bushnell Nielsen, Bridget M. Hubing, L. Katie Mason,* and *Malinda J. Eskra* of *Reinhart, Boerner, Van Deuren*, *S.C.*, Waukesha. |
| Respondent | On behalf of the defendants-respondents-cross-appellants, the cause was submitted on the briefs of *Douglas M. Poland* of *Rathje Woodward*, Madison, *John C. O'Quinne* of *Kirkland & Ellis LLP,* |

Washington, D.C., and *Michael B. Slade* and *Yates M. French* of *Kirkland & Ellis LLP*, Chicago, Illinois.

COURT OF APPEALS
DECISION
DATED AND FILED

May 6, 2020

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal No. 2018AP960**

Cir. Ct. No. 2015CV546

**STATE OF WISCONSIN**

**IN COURT OF APPEALS**

COUNTRY VISIONS COOPERATIVE,

  PLAINTIFF-APPELLANT-CROSS-RESPONDENT,

V.

ARCHER-DANIELS-MIDLAND COMPANY AND UNITED COOPERATIVE,

  DEFENDANTS-RESPONDENTS-CROSS-APPELLANTS.

---

APPEAL and CROSS-APPEAL from a judgment of the circuit court for Fond du Lac County: GARY R. SHARPE, Judge. *Affirmed in part; reversed in part and cause remanded with directions.*

Before Neubauer, C.J., Gundrum and Davis, JJ.

¶1 DAVIS, J. A right of first refusal (ROFR) is an agreement in which an owner of property (typically real estate) conveys a right to another party to match any offer made for the property. If the ROFR holder matches the offer, any sale

must be to the holder. *See MS Real Estate Holdings, LLC v. Donald P. Fox Family Trust*, 2015 WI 49, ¶24, 362 Wis. 2d 258, 864 N.W.2d 83 (an ROFR "is a contractual right to be first in line should the opportunity to purchase or lease a property arise").

¶2 Ordinarily, exercise of such a right is straightforward—the property owner receives an offer from a prospective buyer which it wishes to accept and communicates that offer to the ROFR holder, who then has a certain period of time to match it. Whether and how the right applies becomes more involved, however, when the property owner wishes to sell the property as part of a larger parcel or, as in this case, as part of a sale of multiple parcels in a single transaction. In these circumstances, Wisconsin precedent requires that the transaction be scrutinized to determine what portion of the purchase price is properly allocable to the property subject to the ROFR. *Wilber Lime Prods., Inc. v. Ahrndt*, 2003 WI App 259, ¶¶11-14, 268 Wis. 2d 650, 673 N.W.2d 339. That allocated portion becomes the price at which the ROFR may then be exercised as part of a specific performance remedy. *Id.*, ¶¶12-13. *Wilber Lime* holds that in the event of a dispute on this point, the exercise price should be determined based on the subject property's actual "fair market value" (as opposed to a more formulaic, pro rata approach adopted in some jurisdictions, based on the percentage of acreage the subject parcel bears to the whole). *Id.*, ¶¶8-14.

¶3 The proper application and breadth of that holding is at the heart of this appeal. Here we must apply *Wilber Lime* to a case involving some complicating twists, starting with the fact that the property owner, Archer-Daniels-Midland Company (ADM), and the offeror, United Cooperative (United), (collectively, Defendants) purportedly carved out the sale of the subject parcel into a separate, standalone transaction *after* Defendants had initially negotiated a single $25 million

"package deal" for that parcel, three other parcels, and accompanying business assets. We say "purportedly" because the ROFR holder, Country Visions Cooperative (Country Visions), alleged at trial, and the trial court agreed, that the claimed standalone nature of this sale was a sham—that in reality ADM and United agreed to an artificially inflated "standalone" price of $20 million for the property after learning of, and in order to defeat, Country Visions' ROFR, while tying this sham sale to a collective sale of the other three parcels and all business assets at an artificially *de*flated price of $5 million.

¶4 Application of *Wilber Lime*'s specific performance remedy leads to a second twist. Unwinding the sham $20 million sale required a judicial determination as to the appropriate price at which the ROFR could be exercised. In this case, that meant considering evidence that the buyer was uniquely situated to put the property to a specific use, and therefore incentivized to pay more than "fair market value" as measured by traditional appraisal methods. In other words, Defendants argued (while still denying there was any sham sale in the first place) that in a bona fide standalone transaction United would have paid considerably more than the property's "appraised" value. That is because United would be able to create an income stream with this parcel that few if any other buyers, including Country Visions, could duplicate. The trial court accepted this argument, resulting in a judicially determined price of $16.6 million, coupled with a new fifteen-day offer period for Country Visions to match it (currently stayed pending this appeal). That price was *lower* than the $20 million offer price that the trial court found was a sham, but *higher* than the price generated by appraisal methods chiefly designed to measure fair market value in the absence of an actual buyer.

¶5 Both sides appeal these findings, along with other rulings we will address in the course of this decision. With one exception that may or may not

prove significant, we affirm the trial court. We find that the trial court did not err in finding the purported standalone $20 million sale a sham. Nor did the court err in fashioning a specific performance remedy that considered United's heightened economic incentives, to arrive at a price that best approximated the offer United would have made in a true standalone sale. We cannot, however, fully accept the exercise price found by the trial court. This is because it is not clear from the trial court's decision, or from the testimony and other evidence in this record, that the exercise price reflected *only* the value of the real estate that is the subject of Country Visions' ROFR or whether it also included non real estate-related business assets that were *not* part of the real property to which the ROFR is limited.

¶6     Remand is thus necessary to ensure that the ROFR exercise price is based on an "apples-to-apples" comparison. That is, the trial court should determine whether the price at which it decided Country Visions can exercise its ROFR is based only on the value of the real property and, if it is not, what portion of that price is properly allocable to the real property. Further fact-finding may impact the trial court's denial of compensatory damages as well, since that denial was tied to its decision on the exercise price.

## BACKGROUND

*Factual Background*

¶7     Although this case centers on Country Visions' attempt to enforce an ROFR for a property that United purchased from ADM, none of these parties actually entered into the original ROFR. Rather, in 2007 two entities, Golden Grain LLC (Golden Grain) and Agri-Land Co-op (Agri-Land) (collectively, Golden), entered into an ROFR agreement with Olsen Brothers Enterprises LLP (Olsen Brothers) for certain real estate located in Ripon, Wisconsin. That property, which

we will call the Ripon Property, included a substantial grain storage and transport facility surrounded by prime agricultural land and connected to rail lines. The ROFR provided that for a period of ten years, Olsen Brothers would notify Golden if it received and wished to accept a "bona fide written offer" from a third-party purchaser. In that event, the notice would be "deemed an offer to sell" the property to Golden "upon the terms set forth" in the offer.

¶8 In July 2010, Olsen Brothers sold the Ripon Property to Paul and David Olsen individually. The parties agree that this was a permitted transfer that did not trigger Golden's rights under the ROFR. Five months later, in December 2010, the Olsens filed for bankruptcy. ADM purchased the property out of bankruptcy in August 2011, the bankruptcy court having approved the sale, "free and clear of all Claims, Encumbrances (other than Permitted Encumbrances) and Liabilities." It is undisputed, however, that Golden, the then-ROFR holder, did not receive formal notice of the sale or attend the confirmation hearing. Around the same time, a series of assignments and mergers solely among the original ROFR holders transferred the ROFR from Golden to Country Visions.

¶9 In May 2015, ADM began negotiations to sell its Wisconsin graining business assets to United. By September 2015, the parties had negotiated an asset purchase agreement (APA) that included the Ripon Property and three other grain storage facilities, located in Auroraville, Oshkosh, and Westfield, Wisconsin. Though the APA was never consummated, the parties did agree on a purchase price of $25 million, which included land, improvements and personal property (excluding inventory, which was to be dealt with by separate agreement). For accounting purposes, the parties expressly allocated the purchase price between the real estate and the other assets, with $14,579,000 allocated to the intangible rights

and hard assets of the business and $10,421,000 allocated to the real property (Ripon and the other three parcels).

¶10 Country Visions learned of the pending sale and informed ADM that it held an ROFR on the Ripon Property. ADM and United then attempted to separate the transaction into two sales: (1) the Ripon Property alone and (2) the remaining assets, including the other three parcels and the non real estate-related business assets of the four properties. On October 13, 2015, the parties signed a Commercial Offer to Purchase for the Ripon Property. The price was $20 million. The offer and acceptance was on a standard commercial real estate form but did specify that United "understands that there is a Right of First Refusal owned by Country Visions Cooperative on the Property which is subject to this Offer. In the event Country Visions matches this Offer, [United] agrees that [ADM] is free to close on the transaction with Country Visions ...." The agreement contained no other contingencies. The next day, on October 14, ADM forwarded the accepted offer to Country Visions in order to trigger the window to exercise its ROFR.

¶11 A day later, on October 15, ADM and United signed an Asset and Real Estate Purchase Agreement, transferring the other three properties and the business assets at all four properties for $5 million. Of that $5 million purchase price, $2.8 million was allocated to real estate, with the remaining $2.2 million allocated to the personal property for all four locations. The end result of the two transactions was a collective sale of the same four properties and all related assets for the same $25 million purchase price previously agreed upon. Now, however, the Ripon real estate alone sold for $20 million, in contrast to some unspecified portion of $10,421,000 that had, just weeks earlier, been allocated to the four parcels.

¶12 On October 16, the parties closed on the $5 million deal that had been signed the day before, involving the three non-Ripon properties and personal property for all four parcels. The ROFR period on the Ripon Property deal expired with no matching offer from Country Visions, so Defendants closed on that sale in early November. Country Visions then sued ADM and United.

*Procedural Background*

¶13 Country Visions' suit sought specific performance and damages under various theories, all of which revolved around allegations that the purported standalone nature of the Ripon Property transaction was a sham designed to impede the exercise of Country Visions' ROFR. ADM and United denied these allegations. Separately, ADM moved to reopen the Olsens' bankruptcy case for consideration of "whether a final, non-appealable order approving a real estate sale could extinguish a right of first refusal without affording the holder of the right formal notice and the opportunity to object." *In re Olsen*, 563 B.R. 899, 902 (Bankr. E.D. Wis. 2017). The bankruptcy court reopened the case and concluded that Country Visions had not received notice of the bankruptcy sale sufficient to extinguish whatever contractual rights it might have. *Id.* at 902-05, 909. That order was not appealed.

¶14 The trial court made several relevant pretrial rulings. It determined that Country Visions, as the eventual successor to the Agri-Land mergers, was the proper holder of the ROFR. The court also held that the ROFR was a recorded appurtenant servitude on the Ripon Property, so as to bind ADM to Country Visions' ROFR rights. In a related ruling, the court found that Defendants' affirmative defenses, including laches and equitable estoppel, did not bar Country Visions' claims. Finally, the court found that any compensatory damages available

to Country Visions could be ascertained based on United's profits from operating the Ripon Property; if Defendants believed that Country Visions could not have generated a similar profit, that could "be raised as [a] distinct kind of defense[] to reduce potential damages."

¶15 Following a bench trial, the trial court issued a written decision. The court first determined that United "assigned an arbitrary value of $20 million to the [Ripon] property," and that this was a "sham" offer at a price "well beyond" any of the valuations presented at trial. Consistent with this ruling, the court also found that "the residue of the $25 million price was wholly insufficient to provide reasonable consideration for the remaining parcels purchased which in the opinion of [Defendant's expert] Jack Friedman were worth $8.4 million and not $5 million …." The court concluded that "the $20 million price was inflated for the purpose of preventing Country Visions ... from exercising the right of first refusal."

¶16 The trial court then went on to consider, pursuant to *Wilber Lime*, the appropriate price at which Country Visions should exercise its ROFR as part of a specific performance remedy. Weighing the competing opinions of the parties' experts, the court concluded that although Country Visions' expert, Mark Akers, "did an acceptable job," his methodology was "insufficient in determining value in a sale to United." The court gave greater weight to Friedman's opinion, finding Friedman "very knowledgeable in the grain industry," "most credible in assessing valuation," and "most persuasive." The court found it appropriate that Friedman "evaluated the synergies regarding the Ripon facility," noting that a property's value can include "some inherent qualities that would be attributable to a specific buyer," such as "synergies in a case like United … and its geographical and rail line related

enhancements to value."[1]  Based on Friedman's opinion, with one minor adjustment, the court determined that this price was $16.6 million.[2]

¶17     The trial court next addressed possible damages to compensate for any income lost from the time of the breach of the ROFR through the date of the specific performance order.  The court referenced the testimony of Country Visions' CEO, who had stated that Country Visions would not have paid more than $8 to $9 million for the Ripon Property, in finding that "even had United … used the appropriate valuation ... Country Visions would not have exercised that right at the time."  For this reason, the trial court declined to award compensatory damages based on lost profits.  Perhaps anticipating this appeal, however, the court did arrive at a damages figure:  per its previous ruling, "if it was determined that United … and/or [ADM] assigned an unsupportable purchase price number to the [Ripon Property] ... United … should simply forfeit the profit that it earned between the time of its sham offer and the time of trial."  Based on the trial testimony, the court determined that this amount "would be $2 million as set forth by [Country Visions' expert] in his redirect examination after making adjustments brought out in the cross-examination."  Finally, the trial court declined to award punitive damages, based on its denial of compensatory damages and because of certain factual findings regarding the degree of Defendants' culpability.

---

[1] Friedman testified that the value of the Ripon Property to United was "substantially higher" than the value of the property to Country Visions.  This is because only United could add the Ripon Property's storage and shipping capacity to that of its current properties, in order to transport grain most efficiently, in one hundred-car unit trains, to the most distant markets.

[2] The court found that "[a]lthough Mr. Friedman valued the Ripon Property at $16.7 million when that figure is coupled with the other valuations for the remaining properties the value was overstated by $100,000 so the Court has reduced his estimate as to the Ripon Property from $16.7 to $16.6 million."

¶18     The trial court gave Country Visions fifteen days to exercise the ROFR "by accepting a purchase price of $16.6 million for the subject parcel, land, improvements and fixtures." Country Visions moved for and was granted a stay of that decision pending appeal. Further facts will be noted as relevant to our decision.

## DISCUSSION

¶19     Both parties challenge various aspects of the trial court's findings and conclusions, with each individual challenge subject to a separate standard of review. In that regard, "[f]indings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." WIS. STAT. § 805.17(2) (2017-18).[3] A finding of fact is "clearly erroneous" where "it is against the great weight and clear preponderance of the evidence." *Phelps v. Physicians Ins. Co. of Wis., Inc.*, 2009 WI 74, ¶39, 319 Wis. 2d 1, 768 N.W.2d 615 (citation omitted). This court searches the record not for evidence opposing the trial court's factual findings, but for evidence in support. *Royster-Clark, Inc. v. Olsen's Mill, Inc.*, 2006 WI 46, ¶12, 290 Wis. 2d 264, 714 N.W.2d 530. A trial court's discretionary acts—such as granting specific performance—are reviewed for erroneous exercise of discretion. *Anderson v. Onsager*, 155 Wis. 2d 504, 511-14, 455 N.W.2d 885 (1990). We sustain a discretionary act where the trial court "examined the relevant facts, applied a proper standard of law, and, using a demonstrated rational process, reached a conclusion that a reasonable judge could reach." *Gaugert v. Duve*, 2001 WI 83, ¶44, 244 Wis. 2d 691, 628 N.W.2d 861 (citation omitted). Our review of damage awards is similarly deferential (and in certain respects more so). "We apply a highly deferential standard of review to damage awards, affirming if there is any credible

---

[3] All references to the Wisconsin Statutes are to the 2017-18 version.

evidence which under any reasonable view supports the finding." *Laughland v. Beckett*, 2015 WI App 70, ¶34, 365 Wis. 2d 148, 870 N.W.2d 466 (citing *The Selmer Co. v. Rinn*, 2010 WI App 106, ¶28, 328 Wis. 2d 263, 789 N.W.2d 621). Any "award of punitive damages is within the discretion of the factfinder." *Laughland*, 365 Wis. 2d 148, ¶34. Finally, questions of law are entitled to no deference at all; we decide such questions independently. *State v. Vanmanivong*, 2003 WI 41, ¶17, 261 Wis. 2d 202, 661 N.W.2d 76.

*The Trial Court's Conclusion that the $20 Million Offer to Country Visions Was a "Sham" Was Not Clearly Erroneous*

¶20    Defendants argue that the trial court erred as a matter of law in determining that the $20 million offer to Country Visions was a sham. Defendants maintain that the offer for the Ripon Property "cannot be deemed a 'sham' simply because the circuit court found the $20 million offer price to exceed fair market value by less than 20%," especially in light of testimony that the property was worth at least $20 million to United. Defendants further contend that none of the circumstances of the sale indicate that it was a sham, since upon learning of Country Visions' ROFR, Defendants separated the $25 million transaction into two separate sales. Defendants point out that the parties closed on the Ripon Property *after* closing on the sale of the other three properties. Therefore, had United "truly received a sweetheart deal on the other three properties, United could have taken them and left ADM holding the bag (and the Ripon [P]roperty)."

¶21    Although Defendants frame this issue as one of contract interpretation, we are in fact not being asked to interpret a term within the ROFR or any other contract, which might allow for de novo review. Instead, we must determine whether there was a proper basis for the trial court's findings of fact concerning what were, in essence, alleged breaches of ADM's implied duty of good

11

faith and fair dealing in the performance of its contract[4] and United's obligation not to interfere with Country Visions' rights under the same agreement.[5] Although these duties exist as a matter of law, the circumstances concerning their breach involve findings of fact. We address those findings under the "clearly erroneous" standard.

¶22 In determining whether the offer to Country Visions was a "sham," the trial court considered communications between ADM and United during the time in which Defendants were attempting to separate the $25 million transaction into two distinct sales. In an e-mail to ADM, counsel for United appeared to confirm that the transaction for the Ripon Property was tied to the sale of the other three properties:

> This [Ripon] offer is good but we don't have the offer for the other prong. During our discussion earlier the 2 were going to go hand in hand. Are we close to the other one being ready? We need to be sure they are tied. I know there must be a bit of a trust factor but we need to do the 2 together. I think language in the "other" one needs ADM to accept both.

¶23 This email, which expressly showed that the two transactions had to be "tied," strongly supports the trial court's findings that there was no standalone sale. Additional evidence established that when Defendants first learned that Country Visions sought to exercise its ROFR, they briefly considered restructuring the Ripon sale as a ten-year lease. Because the ROFR would have expired during that time period, the effect would have been to defeat Country Visions' right to purchase the Ripon Property.

---

[4] ***Foseid v. State Bank of Cross Plains***, 197 Wis. 2d 772, 791-96, 541 N.W.2d 203 (Ct. App. 1995).

[5] ***Briesemeister v. Lehner***, 2006 WI App 140, ¶¶47-48, 295 Wis. 2d 429, 720 N.W.2d 531.

¶24 Finally, the offer conveyed to Country Visions contained a ninety-day "reservation" to the seller that would have prevented Country Visions' use of the property during the 2015 harvest season under the offer forwarded to it. ADM and United, however, negotiated a "side agreement": a temporary lease allowing United (and *only* United) to immediately occupy the premises, along with a transfer of all personal property and inventory at the Ripon Property. The effect was to increase the value of the property to United over and above its value to Country Visions. The court did not err in concluding that this "side agreement" was a "ruse," the effect of which was to "put United … in a much better position [than Country Visions] in acquiring ownership … simply based upon the timing."

¶25 Defendants' reliance on when the sales closed is also misplaced. To be sure, the parties closed on the sale of the three properties first and the Ripon Property second. Defendants are incorrect, however, in suggesting that United could have "walked away" from further negotiations for the Ripon Property after closing on the other three properties. At the time of both signing and closing on the other three properties (October 14 and 15 respectively), the parties had *already signed* the Ripon Property agreement. That agreement recognized Country Visions' ROFR but contained no other contingencies and did not otherwise allow United to exit the deal. That the formal closing occurred later (after Country Visions' right to match expired) is irrelevant. It is disingenuous to suggest that the timing of the contracts necessarily made these two separate, bona fide sales. Rather, there was sufficient evidence for the trial court to conclude that these were interconnected transactions and that the purported independence of the Ripon Property deal was a sham. We will not disturb that finding.

*The Trial Court Did Not Err as a Matter of Law in Determining Country Visions'*
*Remedy: Specific Performance at a Court-Determined Price*

¶26    Having determined that the $20 million price was artificially inflated, the trial court concluded that the correct remedy was to order specific performance, to allow exercise of the ROFR at a court-determined price.  To reach this result, the court relied primarily on *Wilber Lime*.  Defendants claim that we should review this decision under a de novo standard, but that assertion is only partly correct.  We review de novo whether, pursuant to *Wilber Lime*, specific performance is a permissible remedy; we review the trial court's actual decision to award such a remedy for an erroneous exercise of discretion.  *See Anderson*, 155 Wis. 2d at 511-514.

¶27    In *Wilber Lime*, Wilber Lime held an ROFR for twenty-five acres of a 180-acre farm owned by Robert Ahrndt.  *Wilber Lime Prods., Inc.*, 268 Wis. 2d 650, ¶1.  At Ahrndt's death, his estate sold the entire farm to his daughter, without providing notice to Wilber Lime.  *Id.*, ¶3.  Upon learning of the sale, Wilber Lime filed suit, claiming that the sale triggered its right to purchase the twenty-five acres.  *Id.*, ¶5.  The trial court agreed and ordered specific performance; we affirmed.  *Id.*, ¶1.  We noted that the case was one of first impression in Wisconsin and that courts in other states were split as to whether a sale could even proceed when only a portion of property the owner wished to sell was subject to an ROFR.  We agreed that such a sale could proceed, that the sale triggered Wilber Lime's ROFR, and that a grant of specific performance was appropriate to protect that right.  *Id.*, ¶12.

¶28    With respect to the purchase price, we recognized that the twenty-five acres subject to the ROFR might not be of the same value as the remainder of the property.  *Id.*, ¶13.  Therefore, we decided

> that the most equitable resolution is to determine the fair market value of the twenty-five acres.  This protects the landowner from being forced to sell the twenty-five acres at a price lower than its fair market value and therefore lower than the owner would accept if the twenty-five acres were

> sold alone. It also prevents Wilber Lime from receiving a windfall of being able to purchase the land at a price lower than its value. This approach best fulfills the intentions of the parties when they entered into the agreement granting Wilber Lime the right of first refusal.

*Id.* We remanded "for a determination of the fair market value of the twenty-five acres," so that Wilber Lime could "have the opportunity to purchase the twenty-five acres at that price if it so chooses." *Id.*, ¶14.

¶29 Defendants argue that *Wilber Lime* is inapplicable because the Ripon Property was not sold as part of a "package deal." As Defendants would have it, there is no need to resort to the remedies of *Wilber Lime* where the parties negotiated a standalone price of $20 million for the Ripon Property. Our previous discussion puts this argument to rest: the evidence supports the trial court's conclusion that these were *not* two independent transactions but instead a single disguised "package deal," with an arbitrarily inflated $20 million price assigned to the Ripon Property. This also means that the case law upon which Defendants rely, even if it were binding, is inapplicable. In both *Uno Restaurants* and *Rappaport*, the ROFR holder was unsuccessful in challenging the sale (and sale price) of the subject property, because the offer was a good-faith reflection of what the buyer was *actually willing to pay*, and because the sale was *not in fact contingent* on any other sale. *Uno Rests., Inc. v. Boston Kenmore Realty Corp.*, 805 N.E.2d 957, 963-66 (Mass. 2004); *Rappaport v. Estate of Banfield ex rel. Hoguet*, 2007 VT 25, ¶¶23-32, 924 A.2d 72. These are not the facts here. Therefore, we find that *Wilber Lime* does provide the appropriate remedy: an award of specific performance (and damages as might be proven, as discussed below).

¶30 Defendants argue against specific performance based on the testimony of Country Visions' CEO that Country Visions would not have purchased

the Ripon Property in 2015 for any price above $9 million. This reasoning, however, is contradicted both by the holding of *Wilber Lime* and by the nature of the equitable remedy, which "[c]ourts may apply ... as necessary to meet the needs of a particular case." *Perpignani v. Vonasek*, 139 Wis. 2d 695, 737, 408 N.W.2d 1 (1987). We see no reason to disturb the trial court's exercise of discretion to adopt such a remedy. The court considered the relevant facts, correctly applied *Wilber Lime*, and reached a reasonable conclusion. Indeed, it would have been inequitable *not* to give Country Visions the opportunity to exercise its ROFR, in light of Defendants' deliberate attempt to thwart Country Visions' rights under it.[6]

*The Trial Court Did Not Err as a Matter of Law in Accepting a Price Derived from Defendants' Valuation Methodology, Based on United's Unique Ability to Generate Income at the Property*

¶31 We turn now to the question of the appropriate price at which the ROFR was to be exercised, a point of vigorous dispute. Although the trial court rejected Defendants' claim that the Ripon Property sale was a bona fide standalone transaction, the court did accept the opinion of Defendants' expert, Jack Friedman, who testified both to the value of the Ripon Property to United and to the related question of what portion of the $25 million price in the APA was properly allocable to the Ripon Property on a standalone basis. Friedman assumed, and the trial court agreed, that these numbers could be determined with reference to United's unique position to maximize the income-producing potential of the property. This assumption formed the backbone of Friedman's opinion—and the trial court's conclusion—that $16.6 million of the $25 million price in the original APA was

---

[6] However, as the trial court found, and as discussed later in this opinion, evidence as to the price that Country Visions would have been willing to pay for the property in 2015 *is* relevant, and perhaps dispositive, on the *legal* remedy of damages.

16

properly allocable to the Ripon Property. Country Visions challenges the legitimacy of this assumption and, by extension, the court-ordered exercise price.

¶32    Country Visions first argues that it was error for the trial court to accept Defendants' income-based methodology, where Country Visions provided a valuation using a sales comparison approach. Country Visions points out that Wisconsin has adopted a three-tier methodology to determine fair market value. *Metropolitan Assocs. v. City of Milwaukee*, 2018 WI 4, ¶31, 379 Wis. 2d 141, 905 N.W.2d 784. Under the first tier, prior sales of the property are examined as the best evidence of value. *Id.*, ¶32. If there are no recent sales, then, under the second tier, recent sales of comparable properties are examined (the sales comparison approach). *Id.*, ¶33. It is only when neither of these approaches is available that other factors are considered, such as "cost, depreciation, replacement value, [and] income." *Id.*, ¶34 (citation omitted). Both the income and the cost approaches "fit under the umbrella of tier 3 analysis."[7] *Id.*

¶33    Country Visions correctly cites the law as it pertains to appraisals for tax assessment, eminent domain, and similar proceedings. We are not convinced, however, that this rigid methodology applies to the present action. The concept of the three-tier hierarchy arises out of WIS. STAT. § 70.32, which specifies how real estate should be valued for property tax assessments. *See* § 70.32(1); *Metropolitan Assocs.*, 379 Wis. 2d 141, ¶31 ("We interpreted [§] 70.32(1) to set forth a [three-tier] hierarchical valuation methodology for single-property appraisal. The text of the statute lists three sources of information in a specific order, with [this court]

---

[7] Defendants argue that Country Visions forfeited this argument by not raising it with the trial court. *See* **Schill v. Wisconsin Rapids Sch. Dist.**, 2010 WI 86, ¶45 & n.21, 327 Wis. 2d 572, 786 N.W.2d 177 (issues not raised in the circuit court are generally forfeited). Country Visions' post-trial briefing, however, discussed case law holding that an income capitalization method is not appropriate where there is evidence of comparable sales.

clarifying this order as indicative of the quality of the information each source provides." (citation omitted)). Our supreme court has applied this methodology in similar contexts, most notably eminent domain proceedings. *See*, e.g., ***Leathem Smith Lodge, Inc. v. State***, 94 Wis. 2d 406, 413, 288 N.W.2d 808 (1980). The methodology makes sense in these situations, where the aim is to create a uniform method for establishing fair market value and where there is no actual buyer seeking to purchase the property. *See* ***State ex rel. Levine v. Board of Review***, 191 Wis. 2d 363, 372-73, 528 N.W.2d 424 (1995) (Section 70.32(1) "seeks to ensure a uniform method of taxation by requiring assessors" to use the three-tier methodology).

¶34 This is a contract case where the goal is fundamentally different. Consistent with black-letter principles of contract law, ***Wilber Lime*** seeks to place the parties in the position they would have been in had ADM properly performed its contractual obligation to provide Country Visions the opportunity to match a standalone, bona fide offer for the property, had one been made by United. *See* ***United Leasing & Financial Servs., Inc. v. R.F. Optical, Inc.***, 103 Wis. 2d 488, 492, 309 N.W.2d 23 (Ct. App. 1981) ("The elementary rule of contract damages is that a party is entitled to be placed in the same position as if the breach had not occurred."). A "bona fide offer" by a known buyer is not necessarily equivalent to "fair market value," at least to the extent that the latter term refers to the three-tier methodology described above. Appraisal concepts may be useful evidentiary tools, but it does not make sense to adhere to an inflexible methodology where we are more interested in discerning the most likely arms-length purchase price *pertaining to this buyer*.

¶35 This result logically follows from ***Wilber Lime***, which was concerned with two questions: (1) the rights of the parties when property to which an ROFR attaches is sold as part of a "package deal"; and (2) how to determine the appropriate

exercise price for the ROFR at issue. *Wilber Lime Prods., Inc.*, 268 Wis. 2d 650, ¶¶8-13. We evinced a strong concern for the equities of that situation, determining, for example, that it would be unfair to *prevent* the sale of the larger parcel until the owner received an offer for the smaller portion subject to the ROFR. *Id.*, ¶¶10-12. We also rejected the notion that in assessing the exercise price, the seller should be shortchanged based on a formulaic "pro rata" approach that did not account for the possibility that the parcel subject to the ROFR might have a higher value than the remainder of the "package." *Id.*, ¶¶11-12. So we took what we labeled a "middle road" approach, finding it most appropriate that the sale of the larger parcel should trigger the ROFR based on the actual value of the ROFR parcel, even if that value was different than the remaining property. *Id.*, ¶11. By ordering specific performance at "fair market value," we were simply seeking to avoid a "windfall"; we assumed that neither grantor nor grantee would gain or lose merely because of the existence of the ROFR. *Id.* ¶13.

¶36 Ultimately, "fair market value" is what a willing buyer would be willing to pay a willing seller in an arms-length transaction. *Bloomer Hous. Ltd. P'ship v. City of Bloomer*, 2002 WI App 252, ¶14, 257 Wis. 2d 883, 653 N.W.2d 309. And while a seller cannot speculate as to what some hypothetical uniquely motivated buyer might be willing to pay, this case involved no such speculation. Persuasive evidence (according to the trial court, to which we owe deference) showed that United had ample economic incentive to offer a higher-than-appraised price for the Ripon Property, based on unique synergies it offered to United's business. These synergies included United's ability to leverage the Ripon Property's location and storage capacity; by linking the property to other nearby United locations, United (but not its competitors) could avail itself of one hundred car-unit rail capacities and achieve efficiencies. This led Friedman to testify that

the Ripon Property "fit like a glove" into United's existing portfolio of Fox Valley grain properties.

¶37     In short, although ADM is not entitled to thwart Country Visions' ROFR through a "sham" transaction, nor is Country Visions entitled to what would amount to an artificially low exercise price—essentially a windfall given the trial court's factual findings as to how a bona fide purchase price offered by this particular buyer would have been derived.  The trial court did not err in considering the unique synergies specific to United in determining an appropriate exercise price under the equitable remedy it adopted.

*The Trial Court May Have Been "Clearly Erroneous" in Setting the Exercise Price at $16.6 Million, if this Price Includes Personal Property*

¶38     Having properly concluded that it could rely on Defendants' methodology, the trial court *may* have been correct in accepting the resulting valuation, in that the court articulated a thoughtful and reasoned basis for finding Defendants' expert "most persuasive."  Country Visions, however, argues that the $16.6 million price went beyond the real property that was subject to Country Visions' ROFR and also, and improperly, included the value of all the personal property necessary to run a business on that real estate.

¶39     We agree that this is a concern.  On the current record, we perceive a potential "apples-to-oranges" problem.  The original proposed sale from ADM to United (no actual contract was ever signed) contemplated a $25 million purchase price for four parcels of real estate, together with numerous other business assets. The business assets were specifically set forth in the APA.  They included furniture, equipment and other personal property; inventory; ADM's rights, title, and interest in grain contracts; ADM's rights and interests in other contracts (as defined in the

APA); and licenses and permits (also as defined).[8]  The APA contained an express allocation of the purchase price between these other assets and the real estate:  a whopping $14,579,000 for the business assets and a mere $10,421,000 for all four parcels of real estate combined (in contrast to the $20 million price agreed to for the Ripon real estate alone just a few weeks later in the "sham" sale).

¶40    Neither party suggests that this previous allocation is binding as setting an appropriate price for either the Ripon Property or the personal property. What is notable, however, is that nowhere does it appear that Friedman—and by extension the trial court—took into account the value of the personal property *at all*. The $16.6 million value was by Friedman's own admission a "business valuation," and it appeared to include all of the assets at that location necessary to generate the income that drove his analysis.

¶41    By contrast, Country Visions' ROFR right is limited to real estate, contained within a legal description attached to the ROFR.[9]  Country Visions should not have to pay $16.6 million for real estate based on a valuation method that bakes in the ownership and use of assets Country Visions will not receive in the event it exercises its ROFR.   Put another way, Friedman's $16.6 million "business

---

[8]  While inventory and grain contracts were included within the definition of "Assets" that were the subject of the $25 million purchase price in the APA, the APA also stated that both of these asset categories "shall be valued and transferred" pursuant to agreements set forth as exhibits to the APA.  The draft APA contained only blank pages for these exhibits.  Our assumption is that the inventory and grain contracts were intended to be sold separately and not included within the assets transferred as part of the $25 million purchase price, but this assumption can be definitively addressed on remand.

[9]  Of course, legally, this also includes all buildings, improvements, and fixtures, as the trial court's order indicated.  *See Premonstratensian Fathers v. Badger Mut. Ins. Co.*, 46 Wis. 2d 362, 367, 175 N.W.2d 237 (1970).

valuation" may represent a fair allocation of the $25 million purchase price of the business being conducted on the Ripon Property, but it cannot represent Country Visions' price for just the Ripon Property. A further allocation, one that separates out the personal property, is necessary.

¶42 We cannot, however, definitively determine whether the $16.6 million price does or does not include the value of personal property, let alone what the allocation should be. Testimony on this point was sparse.[10] Friedman's valuation was based on the future income-producing potential of the Ripon Property, so the assumption was that the property would be functioning as a normal business; i.e., with all business assets necessary to generate the projected income on which his opinion was based.[11] The trial court deducted $100,000 from that valuation, but it apparently did so only to make the value of the properties total $25 million. It is possible—as Defendants argue—that the trial court implicitly found that the personal property had "minimal actual value." The trial court's decision, however, merely indicated that the personal property "was worth far less" than the initial $14 million allocation in the APA. Without a more specific finding, we cannot conclude

---

[10] Defendants argue that Country Visions forfeited this argument by not raising it at trial. In its posttrial briefing, however, Country Visions criticized Friedman's methodology by pointing out that its ROFR applies to real property only and that a valuation that takes into account personal property would be improper.

[11] Friedman testified to a "standalone" value of the Ripon Property of $8.3 million, which he characterized as meaning the land, buildings, and business assets without any additional synergies created by virtue of United's unique ability to increase income on the property. The remainder of the $16.6 million total price was necessarily attributable to these additional synergies. Friedman acknowledged that United had not, to date, availed itself of these synergies because of the need for additional capital costs, but assumed that it would do so once the purchase was finalized through resolution of this lawsuit.

that the personal property was essentially worthless.[12]   Indeed, Country Visions argues that the value of the equipment alone is "multiple millions of dollars," and this argument is supported, at least on the surface, by values United internally assigned to the personal property immediately after purchase.

¶43    We therefore remand so that the trial court can supplement and modify its decision as may be appropriate.  The goal is to determine what portion of the $25 million previously agreed-upon price is fairly allocable to the real estate alone, had United made a bona fide offer for just that property.  Since this exercise will require eliminating the personal property from consideration, it would presumptively suggest that the court simply determine the values for that property and reduce the previously found $16.6 million exercise price accordingly.  On the other hand, had United made a bona fide offer, it is possible that personal property would have been given less consideration in light of the synergies offered by the real estate.  In resolving this factual issue, the trial court may well wish to require supplemental briefing and an evidentiary hearing, although we defer to it as to how best to conduct this necessary inquiry.

*On Remand, the Trial Court Should Revisit Whether Country Visions is Entitled to Compensatory, but Not Punitive, Damages*

¶44    If, on remand, the trial court calculates a lower exercise price based on the exclusion of personal property, then it follows that its decision denying damages may also be in error.  Recall that the trial court decided that Country Visions, by being deprived of its right to exercise its ROFR at a bona fide price, suffered damages of $2 million.  This represented "the profit that [United] earned

---

[12] In fact, it seems doubtful that the personal property would have no value under an income approach.  Defendants' other expert, Dennis Vogan, testified that an income approach to appraising a grain elevator property requires the appraiser to "identify the contributions of land, buildings, machinery, and equipment, which can have certain fixture and non-fixture relationships."

between the time of its sham offer and the time of trial." But the court also denied such damages due to what amounted to a lack of causation, since Country Visions would not have exercised its ROFR in 2015 at the $16.6 million court-determined price. If the exercise price changes on remand, however, then the court will need to revisit its conclusion on damages and determine whether Country Visions is entitled to compensatory damages for lost profits from the time of the sham offer through the time of its exercise of the ROFR.[13]

¶45 Defendants argue that the trial court's damages calculation is based on an improper disgorgement remedy. While conceding that disgorgement is available for certain claims, such as breach of fiduciary duty, they claim it is not a remedy for Country Visions' contract or tortious interference claims. Therefore, Defendants contend, the trial court erred as a matter of law by calculating compensatory damages with reference to United's profits, instead of determining the estimated actual damages, if any, that Country Visions suffered by not purchasing the Ripon Property in 2015.

¶46 We agree that disgorgement—a remedy that measures and strips a defendant of wrongfully derived profits—is generally unavailable in a breach of contract or tortious interference with contract dispute. *See* RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT §§ 39, 44, 49, 51 (AM. LAW INST. 2011). Despite the trial court's occasional suggestion to the contrary, however, we do not consider the $2 million figure a true disgorgement remedy, for two reasons.

---

[13] The trial court implicitly concluded—and we agree—that compensatory damages may be available in addition to equitable remedies in an action concerning a party's rights under an ROFR. *See* WIS. STAT. § 840.03(1) (permitting "[a]ny person having an interest in real property [to] bring an action relating to that interest, in which the person may demand ... singly, or in any combination ... [s]pecific performance of contract ... [and] [d]amages.").

24

First, in a pretrial ruling on this issue, the court explained how Country Visions could establish damages:

> I think that the profit numbers are the profit numbers as generated by the current operation, and if there are the absence of economies of scale that are a part of the United … operation, those can be raised as distinct kind of defenses to reduce potential damages saying that Country Visions couldn't have generated this same kind of thing.

If the focus were solely on disgorging United's wrongfully obtained profit, considerations of Country Visions' comparative performance would be immaterial.

¶47 Second, Country Visions' damages theory was based on the opinion of its expert, Dr. Terry Smith, who estimated *Country Visions'* likely performance at the Ripon Property, based on a combination of United's and ADM's financial data. Smith testified that the $2 million figure was derived using historical data from ADM as to inventory turns at the property, along with post-purchase data from United showing margins on a per-bushel basis. Smith's reliance on this data appears to be nothing more than application of a "yardstick" method of damages calculation. *See* **G.M. Brod & Co. v. U.S. Home Corp.**, 759 F.2d 1526, 1538-39 (11th Cir. 1985) (citation omitted). Within certain limits that do not appear to be exceeded here, our supreme court has approved the use of such measures in cases involving business acquisitions where the aggrieved party has no track record. **Mrozek v. Intra. Fin. Corp.**, 2005 WI 73, ¶¶38, 42, 281 Wis. 2d 448, 699 N.W.2d 54.[14] We cannot say that the trial court erred as a matter of law in accepting Country Visions' damages methodology.

---

[14] In **Mrozek**, our supreme court accepted this model in concept but rejected its application in that case due to the lack of evidence showing expenses necessary to determine net profitability. **Mrozek v. Intra Fin. Corp**, 2005 WI 73, ¶¶38, 42, 281 Wis. 2d 448, 699 N.W.2d 54. That is not an issue here—Smith's report and his testimony demonstrate that he accounted for expenses in his analysis.

¶48    Therefore, on remand the trial court should reconsider the appropriateness of awarding $2 million in compensatory damages, along with an ongoing per diem amount for damages sustained since trial. As noted above, we do not reject Smith's methodology. However, given the passage of time and the inherent difficulty in proving lost profits, coupled with potentially more data by which to create a yardstick, the damages figure may be different, and the parties should be permitted to explore that possibility. We also reiterate that Country Visions is not necessarily entitled to recover damages, but if the trial court determines that Country Visions would have, in 2015, purchased the Ripon Property at whatever exercise price is found to be appropriate, then the trial court should further determine whether compensatory damages are available, and their amount.[15]

¶49    Country Visions argues that if the trial court awards compensatory damages on remand, the court should also consider imposition of punitive damages. As a threshold matter, punitive damages are only available where there has been an award of compensatory damages. *Tucker v. Marcus*, 142 Wis. 2d 425, 438-39, 418 N.W.2d 818 (1988). But such an award does not end the inquiry. To receive punitive damages a plaintiff must also show "that the defendant acted maliciously toward the plaintiff or in an intentional disregard of the rights of the plaintiff." WIS. STAT. § 895.043(3). A defendant acts with "intentional disregard" where he or he "act[s] with a purpose to disregard the plaintiff's rights" or is "aware that his or her conduct is substantially certain to result in the plaintiff's rights being disregarded." *Strenke v. Hogner*, 2005 WI 25, ¶36, 279 Wis. 2d 52, 694 N.W.2d 296. Thus a

---

[15] We note that at least a portion of Smith's calculations appear to have been tied to an assumed exercise price of $7.4 million. He also testified that his assumption concerning the impact of fixed expenses was based on a "shorter term" model, which we suspect might not be appropriate in computing per diem damages extending beyond the period when this case went to trial. These issues can be addressed on remand as necessary.

defendant's conduct must be "deliberate," "must actually disregard the rights of the plaintiff," and "must be sufficiently aggravated to warrant punishment by punitive damages." *Id.*, ¶38.

¶50 The trial court determined that United's conduct did not meet this standard.[16] For example, United "was not aware [of] the existence of the Right of First Refusal"; when United learned of the ROFR, it "scramble[d] to reach agreement on a number that had not previously been important to [United]." These factual findings are supported by the evidence presented at trial; as a result, they are not clearly erroneous. There is no reason why the court should revisit this issue on remand.

### *The Trial Court Did Not Err As a Matter of Law In Holding That the ROFR Was Valid and Enforceable*

¶51 Finally, Defendants challenge summary judgment rulings concerning the validity and enforceability of the ROFR against ADM (which necessarily impact the tortious interference claim against United as well). We review these rulings under a de novo standard. *See Smith v. Dodgeville Mut. Ins. Co.*, 212 Wis. 2d 226, 232, 568 N.W.2d 31 (Ct. App. 1997).

¶52 First, the trial court considered whether the ROFR bound ADM, given that ADM was not a signatory to the original contract and that there had been several transfers of the property. The thrust of this issue is whether the ROFR is a so-called "appurtenant servitude" that "runs with the land"—and therefore is enforceable by

---

[16] To clarify, although the trial court's decision refers to the conduct of "Defendants," United is the only defendant against whom Country Visions could potentially recover punitive damages. Punitive damages are unavailable for the contract-based claims brought against ADM. *See Schwigel v. Kohlmann*, 2005 WI App 44, ¶10, 280 Wis. 2d 193, 694 N.W.2d 467 ("In Wisconsin, punitive damages are not available as a remedy for breach of contract.").

Country Visions against ADM—or whether it is "in gross," such that it is only enforceable against Olsen Brothers, the original grantor.

¶53 As a starting point, the ROFR is unquestionably a "servitude," in that it is "a legal device that … runs with land or an interest in land." *Nature Conservancy of Wis., Inc. v. Altnau*, 2008 WI App 115, ¶7, 313 Wis. 2d 382, 756 N.W.2d 641(citing RESTATEMENT (THIRD) OF PROP.: SERVITUDES § 1.1(1) (AM. LAW INST. 2000)); *see also MS Real Estate Holdings, LLC*, 362 Wis. 2d 258, ¶26 ("[A] right of first refusal to purchase or lease land may be a servitude."). The question before us primarily turns on the nature of this right; that is, whether the servitude is "appurtenant" (tied to ownership of the land) or "in gross" (not tied to land ownership).

¶54 In addressing this question it is important to distinguish between the "benefit" of the servitude and its "burden." Under the test set forth in the Third Restatement of Property, which this court adopted in *Nature Conservancy*, a benefit is considered appurtenant "if it serves a purpose that would be more useful to a successor to a property interest held by the original beneficiary of the servitude at the time the servitude was created than it would be to the original beneficiary after transfer of that interest to the successor." RESTATEMENT (THIRD) OF PROP.: SERVITUDES § 4.5(1)(a) (AM. LAW INST. 2000). An example of an appurtenant benefit is discussed in *Nature Conservancy*, where an ROFR was originally conveyed to adjoining landowners of the parcel subject to the ROFR. *Nature Conservancy of Wis., Inc.*, 313 Wis. 2d 382, ¶1. We decided that the benefit of that right properly ran with ownership of the adjoining property, particularly because the interest being protected was hunting rights that were clearly "most beneficial to the owners (and presumably occupiers) of the contiguous properties." *Id.*, ¶19.

¶55 On the other hand, the "burden" of a servitude is concerned not with who gains from the servitude, but rather who continues to have the obligations it creates following a transfer. The Restatement addresses this point as well: "the burden of a servitude is … appurtenant if it could more reasonably be performed by a successor to a property interest held by the original obligor at the time the servitude was created than by the original obligor after having transferred that interest to a successor." RESTATEMENT (THIRD) OF PROP.: SERVITUDES § 4.5(3)(a) (AM. LAW INST. 2000). In contrast, a burden is in gross if it is not tied to land ownership; it "could more reasonably be performed by the original obligor than by a successor to a property interest." *Id.*, § 4.5(3)(b); ***Nature Conservancy of Wis.***, 313 Wis. 2d 382, ¶7.

¶56 This case involves enforcement of the "burden" of a servitude, not its "benefit." Defendants do not challenge Country Visions' standing to enforce the ROFR; i.e., its right to enjoy the "benefit." Rather, they dispute whether ADM is obligated to honor the ROFR or whether, as Defendants contend, Country Visions' only recourse is against the Olsen brothers for breaching the ROFR (by failing to provide notice upon the transfer to ADM during the bankruptcy proceeding).

¶57 We find that the burden of the ROFR is appurtenant, in that it continues with the property until it is extinguished, either by a sale complying with its terms (i.e., one where Country Visions was provided notice) or through the expiration of the ten-year contract period. As long the ROFR remained in effect, ADM, as the owner of the Ripon Property in 2015, was the only party with the capacity to carry out its terms—to provide proper notice of a third-party offer to Country Visions, prior to the sale to United. Therefore, the obligations of the ROFR are necessarily tied to ownership of the Ripon Property.

¶58    As further support, we note that "it appears frequently that when a right or interest is given to a party and that party's 'assigns,' this is taken to mean that the right is to be appurtenant to the land involved." *Nature Conservancy of Wis.*, 313 Wis. 2d 382, ¶12.  To be sure, in *Nature Conservancy*, "[w]e hasten[ed] to say that the use of a particular word or phrase as a term of art in case law will not necessarily dictate its meaning in a particular document." *Id.*, ¶13.  *Nature Conservancy* also differs from the present case in that it considered how to classify a contractual *benefit*.  We nonetheless find *Nature Conservancy*'s reasoning helpful.  The ROFR here states, "This Agreement is binding upon and inures to the benefit of the parties hereto and their respective successors and assigns."  Like the trial court, we find that this language indicates an appurtenant burden on the owner of the Ripon Property.[17]

¶59    This result hardly seems remarkable or unfair from ADM's standpoint.  The ROFR was duly recorded with the Fond du Lac register of deeds, so when ADM purchased the property out of bankruptcy it had, at the very least, constructive notice of the ROFR.  The purpose of recording in this fashion is to provide notice to good-faith purchasers.  The bankruptcy court in the re-opened Olsen brothers proceeding went so far as to characterize ADM as "the ostrich in this case" for ignoring both the appropriate land records and its own title report.  *In re Olsen*, 563 B.R. at 906-07.  That characterization aside, the fact remains that these

---

[17]  Defendants further argue that the ROFR is personal.  "'Personal' means that a servitude benefit or burden is not transferable and does not run with land.  Whether appurtenant or in gross, a servitude benefit or burden may be personal."  RESTATEMENT (THIRD) OF PROP.: SERVITUDES § 1.5(3) (AM. LAW INST. 2000).  Given the facts of this case and the language of the ROFR, as discussed in this section, we conclude that the ROFR burden is not personal but is transferable.

devices are designed precisely to put subsequent purchasers like ADM on notice of servitudes such as the ROFR.[18]

¶60 Finally, we reject Defendants' claim that the trial court erred in refusing to dismiss the case under the affirmative defenses of laches and equitable estoppel. Where, as here, the facts and reasonable inferences are undisputed, it is a question of law whether these doctrines have been established. *See Milas v. Labor Ass'n of Wis., Inc.*, 214 Wis. 2d 1, ¶10, 571 N.W.2d 656 (1997) (equitable estoppel); *State ex rel. McMillian v. Dickey*, 132 Wis. 2d 266, 281 n.15, 392 N.W.2d 453 (Ct. App. 1986), *abrogated on other grounds by State ex rel. Coleman v. McCaughtry*, 2006 WI 49, 290 Wis. 2d 352, 714 N.W.2d 900 (laches).

¶61 "The equitable doctrine of laches is a recognition that a party ought not to be heard when he has not asserted his right for an unreasonable length of time or that he was lacking in diligence in discovering and asserting his right in such a manner so as to place the other party at a disadvantage." *Bade v. Badger Mut. Ins. Co.*, 31 Wis. 2d 38, 47, 142 N.W.2d 218 (1966). The elements of laches are: (1) unreasonable delay in bringing a claim; (2) lack of knowledge by the party asserting laches that the claim would be brought; and (3) prejudice to the party asserting laches if the claim is maintained. *Coleman*, 290 Wis. 2d 352, ¶¶19-20, 28-29. The elements of equitable estoppel are similar, at least for purposes of this case. That doctrine "may be applied when the inaction or action of a party induces reliance by another to that other person's detriment." *Nugent v. Slaght*, 2001 WI App 282, ¶19, 249 Wis. 2d 220, 638 N.W.2d 594.

---

[18] Because we conclude that the ROFR is appurtenant, a related argument posed by Defendants necessarily fails: privity of contract between Country Visions and ADM is not required in order to enforce the ROFR.

¶62     We find neither doctrine applicable on these facts, for similar reasons: there was no unreasonable delay and no prejudice.  As the trial court concluded, there was no unreasonable delay because Country Visions' opportunity to purchase was never actually triggered.  It is undisputed that in 2011 Country Visions received neither formal notice of the bankruptcy sale of the Ripon Property nor a proper offer to purchase pursuant to the ROFR.  It was not unreasonable for Country Visions to assert its ROFR rights only upon learning of an actual offer.

¶63     Nor did the trial court err in finding that any delay was not prejudicial to ADM (or caused no reasonable reliance to its detriment).  If ADM and United had in fact negotiated a bona fide purchase price for the Ripon Property, and if Country Visions had at that point exercised its ROFR, ADM would have received the same price, on the same terms, from Country Visions.  But a bona fide purchase price was *not* negotiated.  Whatever detriment this may be to ADM now is of its own making.

## CONCLUSION

¶64     For the foregoing reasons, we affirm the trial court in all respects other than its adoption of an exercise price that failed to properly account for whether there should be an allocation of some portion of the price to personal property that was not the subject of the ROFR held by Country Visions.  As a result, the case is remanded for further findings consistent with this opinion on the appropriate exercise price, as well as the accompanying impact any revision in price might have on Country Visions' right to recover, and amount of, compensatory damages.

¶65     No costs to either party.

*By the Court.*—Judgment affirmed in part; reversed in part and cause remanded with directions.