# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2018AP960 |

| | |
|---|---|
| COMPLETE TITLE: | Country Visions Cooperative,      Plaintiff-Appellant-Cross-Respondent-Petitioner,    v. Archer-Daniels-Midland Company and United Cooperative,      Defendants-Respondents-Cross-Appellants. |

REVIEW OF DECISION OF THE COURT OF APPEALS
Reported at 392 Wis. 2d 672,946 N.W.2d 169
PDC No:2020 WI App 32 - Published

| | |
|---|---|
| OPINION FILED: | April 21, 2021 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | February 25, 2021 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
|   COURT: | Circuit |
|   COUNTY: | Fond du Lac |
|   JUDGE: | Gary R. Sharpe |

JUSTICES:
ZIEGLER, J., delivered the majority opinion for a unanimous Court. ROGGENSACK, C.J., filed a concurring opinion.
NOT PARTICIPATING:

ATTORNEYS:
For the plaintiff-appellant-cross-respondent-petitioner, there were briefs filed by *David G. Peterson, J. Bushnell Nielsen, Bridget M. Hubing, Malinda J. Eskra*, and *Reinhart Boerner Van Deuren S.C.,* Waukesha. There was an oral argument by *J. Bushnell Nielsen.*

For the defendants-respondents-cross-appellants, there was a brief filed by *Ryan J. Walsh, Amy C. Miller,* and *Eimer Stahl LLP*, Madison; with whom on the brief was *John C. O'Quinn, Megan M. Wold* and *Kirkland & Ellis LLP*, Washington, D.C.; with whom on

the brief was *Michael B. Slade, Yates M. French*, and *Kirkland & Ellis LLP*, Chicago, Illinois. There was an oral argument by *Ryan J. Walsh*.

**2021 WI 35**

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2018AP960
(L.C. No. 2015CV546)

STATE OF WISCONSIN        :       IN SUPREME COURT

**Country Visions Cooperative,**

      **Plaintiff-Appellant-Cross-Respondent-Petitioner,**

      **v.**

**Archer-Daniels-Midland Company and United Cooperative,**

      **Defendants-Respondents-Cross-Appellants.**

**FILED**

**APR 21, 2021**

Sheila T. Reiff
Clerk of Supreme Court

ZIEGLER, J., delivered the majority opinion for a unanimous Court. ROGGENSACK, C.J., filed a concurring opinion.

REVIEW of a decision of the Court of Appeals. *Affirmed.*

¶1 ANNETTE KINGSLAND ZIEGLER, J. This is a review of a published decision of the court of appeals, <u>Country Visions Cooperative v. Archer-Daniels-Midland Co.</u>, 2020 WI App 32, 392 Wis. 2d 672, 946 N.W.2d 169, affirming in part, reversing in part, and remanding with directions the Fond du Lac County circuit court's order[1] granting Country Visions Cooperative ("Country Visions") specific performance of its right of first

_____

[1] The Honorable Gary R. Sharpe presided.

refusal to a property that Archer-Daniels-Midland Co. ("ADM") was attempting to sell to United Cooperative ("United"). This case requires us to determine whether the circuit court properly set the price at which Country Visions may exercise its right of first refusal.

¶2 "A right of first refusal is a contractual right to be first in line should the opportunity to purchase or lease a property arise." MS Real Est. Holdings, LLC v. Donald P. Fox Fam. Tr., 2015 WI 49, ¶24, 362 Wis. 2d 258, 864 N.W.2d 83. Country Visions held a right of first refusal to a parcel of property with a grain facility in Ripon, Wisconsin ("Ripon Property"), which ADM owned. Unbeknownst to Country Visions, ADM entered into negotiations with United to sell the Ripon Property, along with three other parcels throughout Wisconsin. When Country Visions learned of these negotiations, Country Visions informed ADM of its right of first refusal. In response, ADM and United attempted to sever the transaction into two separate transactions. As part of this severance, one of the new transactions became an offer from United to ADM to purchase the Ripon Property alone for $20 million. Country Visions did not match this purchase price, and ADM and United closed on their deal.

¶3 Country Visions brought this lawsuit against ADM and United (collectively, "Defendants") claiming that the $20 million sale was a sham and sought specific performance of its right of first refusal at a lower price. Specifically, Country Visions claims that Defendants artificially inflated the price

2

to overcome Country Visions' right of first refusal. The circuit court held a bench trial and concluded that the $20 million sale of the Ripon Property was a sham. As such, the circuit court determined that the price for the Ripon Property was actually $16.6 million and granted Country Visions 15 days to exercise its right of first refusal at that price.

¶4 Country Visions and Defendants cross-appealed the circuit court's decision to the court of appeals on a variety of issues. The court of appeals affirmed in part, reversed in part, and remanded the case to the circuit court. Country Visions, 392 Wis. 2d 672, ¶64. As relevant to the issue before us——whether the circuit court properly set the price at which Country Visions may exercise its right of first refusal——the court of appeals concluded that the circuit court did not err in how it determined the appropriate right of first refusal exercise price. Id., ¶37. Despite this conclusion, the court of appeals remanded the case to the circuit court to determine whether the $16.6 million exercise price included personal property, which the right of first refusal contract excluded from Country Visions' purchase rights. Id., ¶43.

¶5 Country Visions petitioned this court seeking to set the exercise price at $7.7 million——the price that Country Visions' expert determined as the "fair market value" of the Ripon Property.[2] Country Visions argued that we should do so

---

[2] Neither Country Visions nor Defendants asked us to review any of the other determinations of the court of appeals.

because the circuit court violated basic right of first refusal principles when it set the exercise price based on United's willingness to pay more than the appraised value of the Ripon Property. We disagree.

¶6 We conclude that the circuit court did not err in considering the unique synergies that the Ripon Property provides to United when it set the exercise price higher than the appraised value. For rights of first refusal, a prospective buyer may choose to offer significantly more than the appraised value of a property, especially in the context of a package deal. Thus, depending on the terms of the right of first refusal contract and the facts of the case, a circuit court may set an exercise price that exceeds the appraised value of the burdened property. However, we conclude that remand is necessary to determine whether the $16.6 million exercise price includes more than is called for in the right of first refusal contract. Accordingly, we affirm the court of appeals' decision and remand to the circuit court for proceedings consistent with this opinion.

## I.   FACTUAL BACKGROUND

¶7   This case centers on a right of first refusal contract between Country Visions and ADM.[3]   The right of first refusal contract provides as follows:

> 1.   For a period of ten (10) years from the date hereof (the "ROF Period"), [ADM] hereby grants to [Country Visions] a right of first refusal to purchase the [Ripon Property] or applicable portion thereof, but only on the terms and conditions as provided in this Agreement.   During [the] ROF Period, [ADM] shall not sell, convey or in any way convey or transfer any part [of] the [Ripon Property] without first complying with the provisions of this Agreement.

> 2.    If at any time during the ROF Period, [ADM] desires to sell any part of the [Ripon Property] to a party . . . , pursuant to a bona fide written offer from a third party (the "Third Party Offer"), [ADM] shall first notify [Country Visions] of [ADM's] desire to sell the [Ripon Property] or applicable portion thereof (the "Offered Property") and such notice (the

---

[3] Country Visions and ADM were not the original parties to this contract.   Originally, Golden Grain, LLC and Agri-Land Co-op sold the Ripon Property to Olsen Brothers Enterprises, LLP.   As part of this deal, Olsen Brothers Enterprises granted to Golden Grain and Agri-Land Co-op a right of first refusal to the Ripon Property, which is the right of first refusal contract at issue in this case.

After the right of first refusal contract was executed, Olsen Brothers Enterprises sold the Ripon Property to Paul and David Olsen individually, which did not trigger the right of first refusal.   Paul and David Olsen later filed for bankruptcy. As part of this bankruptcy, ADM purchased the Ripon Property.

Golden Grain and Agri-Land Co-op, through a series of mergers and assignments, transferred their right in the right of first refusal agreement to Country Visions.

Consequently, ADM became the owner of the Ripon Property, and Country Visions became the holder of the right of first refusal to the Ripon Property.

"Notice") shall be deemed an offer to sell the Offered Property upon the terms set forth in the Third Party Offer. The Notice shall identify the bona fide prospective purchaser of the Offered Property in addition to specifying the purchase price and other terms and conditions of such proposed sale (such price and other terms being referred to as "the Third Party Terms") and shall be accompanied by a copy of the Third Party Offer. [Country Visions] shall have the right and option to purchase the Offered Property on the Third Party Terms but only if [Country Visions] shall provide written notice of such election to [ADM] within fifteen (15) days after [Country Visions'] receipt of the Notice. . . .

The parties do not dispute that the right of first refusal contract outlines the following obligations for the exercise of the right of first refusal: ADM cannot sell the Ripon Property without first offering it to Country Visions; Country Visions has a right to purchase the Ripon Property at the third party's purchase price; and Country Visions has 15 days to exercise the right of first refusal and provide notice of its intent to match the third-party offer for the Ripon Property after receiving notice of the third party's offer.

¶8 In May 2015, and unbeknownst to Country Visions, ADM started negotiations to sell its Wisconsin grain business assets to United. Defendants reached a tentative agreement for United to purchase the Ripon Property and three other grain storage facilities around Wisconsin[4] from ADM for a total price of $25 million. The tentative agreement included the land, improvements, and personal property of each facility; it did not

---

[4] The other facilities are located in Westfield, Auroraville, and Oshkosh.

include the inventory of grain that ADM had in storage at each facility.

¶9 Sometime in early October 2015, Country Visions learned of the proposed sale of the Ripon Property. On October 8, 2015, Country Visions informed ADM that it held a right of first refusal to the Ripon Property. Country Visions, pursuant to the right of first refusal contract, requested a copy of the third-party offer to purchase so that it could determine whether it wanted to exercise its right of first refusal.

¶10 At this point, Defendants had not executed their tentative agreement. Upon learning of Country Visions' right of first refusal, Defendants restructured their tentative agreement. Defendants severed the tentative agreement into two separate transactions. One transaction called for United to purchase the Ripon Property from ADM, excluding all inventory and personal property, for $20 million. The other transaction called for United to purchase from ADM the other three properties and all personal property for $5 million and all inventory at its market value. Defendants assigned such a high value to the Ripon Property in part due to the unique synergies the Ripon Property would provide to United's business.[5]

---

[5] The circuit court explained the unique synergies that the Ripon Property provided to United as follows:

> [The Ripon Property] was particularly beneficial to [United] because its 50 railroad car loading capacity in conjunction with United's second location in Ripon and location in Oshkosh all serviced by the same rail

¶11 On October 13, 2015, United provided ADM with a formal offer to purchase the Ripon Property for $20 million, triggering ADM's obligations under the right of first refusal contract. The next day, consistent with its contractual obligations, ADM notified Country Visions of United's formal offer and provided Country Visions with a copy of the offer. Country Visions claimed this $20 million purchase price was a sham and elected not to meet the terms of the third-party offer.

¶12 On October 16, 2015, Defendants closed on the other transaction, purchasing the other three properties and personal property for $5 million. In early November, after the right of first refusal exercise period lapsed, Defendants closed on the

---

line, allowed it to load 100 car trains to ship grain to more lucrative markets.

In addition, the proximity of Auroraville and Westfield allowed trucking of grain to the [Ripon Property] for shipping, all within an operations system geographically proximate to the subject location.

. . . .

[United] intended to use and does use [the Ripon Property] to store and ship grain and does and can implement 100 car trains that increase profitability and can reach markets not ordinarily available without the ability to load 100 car trains. In addition, unlike an agronomy use primarily for storage and manufacture of livestock feed, the United operation loads, ships, stores for future shipping and transfers grain using a margin that requires larger amounts to be handled in order to obtain profitability. The Court does find synergies with United's other facilities and with the ability to load 100 car trains.

8

Ripon Property transaction, with United purchasing it for $20 million. Country Visions brought a lawsuit against Defendants.

## II. PROCEDURAL POSTURE

¶13 On November 11, 2015, Country Visions filed this lawsuit seeking, as relevant to this appeal, a declaratory judgment that it had the right to purchase the Ripon Property for its fair market value and specific performance of the right of first refusal contract at that fair market value.[6]

¶14 After several years of pre-trial motions and decisions not relevant to this appeal, the circuit court held a bench trial. During the bench trial, Country Visions and Defendants supplied expert testimony as to the value of the

---

[6] In response, ADM moved to reopen the bankruptcy proceeding at which it purchased the Ripon Property. In re Olsen, 563 B.R. 899, 902 (Bankr. E.D. Wis. 2017), aff'd sub nom. Archer-Daniels-Midland Co. v. Country Visions Coop., No. 17-cv-0313-bhl, 2021 WL 651553 (E.D. Wis. 2021). The bankruptcy court agreed to reopen the proceeding and addressed the issue of "whether a final, non-appealable order approving a real estate sale could extinguish a right of first refusal without affording the holder of the right formal notice and the opportunity to object." Id. The bankruptcy court held that Country Visions "was not given notice during the bankruptcy proceedings sufficient to satisfy due process before its rights were extinguished," so ADM did not take the Ripon Property "free and clear of [Country Visions]' interest." Id. at 909. Therefore, ADM is still subject to the right of first refusal despite its purchase of the Ripon Property out of bankruptcy.

Ripon Property.[7]    Country Visions' expert, Mark Akers, opined that the Ripon Property was worth $7.7 million.[8]   Defendants'

_____

[7] There were several experts in this case, but the circuit court focused on two in reaching its decision: Mark Akers for Country Visions and Jack Friedman for Defendants.  Similarly, the parties focused on Akers' and Friedman's testimony.  Just as the circuit court and parties did, we will focus on these two experts.

[8] Akers reached this valuation using the cost approach and sales comparison approaches of appraisal.  The cost approach "seeks to measure the cost to replace the property." Adams Outdoor Advert., Ltd. v. City of Madison, 2006 WI 104, ¶35, 294 Wis. 2d 441, 717 N.W.2d 803.   "In the cost approach, the appraiser analyzes the cost of the subject improvements by comparison to the cost to develop similar improvements as evidenced by the cost of construction of substitute properties with the same utility as the subject property." Appraisal Institute, The Appraisal of Real Estate, 377 (13th ed. 2008). Using the cost approach, Akers estimated that the value of the Ripon Property at $7,548,000.

"In the sales comparison approach, an opinion of market value is developed by comparing properties similar to the subject property that have recently sold, are listed for sale, or are under contract (i.e., for which purchase offers and a deposit have been recently submitted)." Id. at 297.  Using the sales comparison approach, Akers estimated the value of the Ripon Property at $7,458,000.

Akers then averaged the cost approach and the sales comparison approach to reach his opinion of value at $7.5 million.  The circuit court believed that his opinion of value was in error based on "errors in the bin size and some inaccuracy about access and some criticism regarding comparables" and determined that $7.7 million was a more accurate reflection of Akers' opinion of value as it was Akers' "higher number on his margin of error."  We accept this as Akers' opinion of value for purposes of this appeal, as both parties do.

expert, Jack Friedman, opined that the Ripon Property was worth $16.6 million to United.[9]

¶15 On May 3, 2018, the circuit court issued a written decision. The court concluded "that the $20 million dollar offer [for the Ripon Property] was a sham at an arbitrarily inflated price" "for the purpose of preventing [Country Visions] from exercising the right of first refusal." The court also found that

> the fair value for [United] to use in purchasing the [Ripon Property] was the $16.6 million dollars testified to by the witness the court believes was

---

[9] Friedman reached this valuation amount by analyzing the value of the Ripon Property "in the context of the $25 million United spent when purchasing four facilities from ADM in 2015." Specifically, Friedman said that "a reasonable approach to valuing the Ripon Property in context of this transaction is to consider what percentage of the total $25 million value was attributable to the Ripon Property."

Friedman used the income capitalization method to approximate the prices of the other three facilities——Westfield, Auroraville, and Oshkosh——that were part of this deal. "In the income capitalization approach, an appraiser analyzes a property's capacity to generate future benefits and capitalizes the income into an indication of present value." Appraisal Institute, supra note 8, at 445. To reach his valuation for the facilities, Friedman looked at the grain storage capacity, rail-loading capability, and quality of cropland near the facility to inform his estimate of value. Using these factors, among others, Friedman assigned $500,000 for the Westfield facility as salvage value only, $2 million for the Auroraville property, and $5.9 million for the Oshkosh facility. Friedman then estimated that the value of the Ripon Property was the remainder of the $25 million total purchase price——$16.7 million. As the circuit court noted in its decision, this number should have been $16.6 million, but this error is of no consequence to our conclusion, and we use $16.6 million as Friedman's opinion of value.

11

most credible in assessing valuation, Jack Friedman, whose credentials as an operator in the grain industry in Iowa and one with experience in valuing and acquiring grain elevator properties together with his own assessment of the values of the other three properties acquired by [United] from [ADM] made his opinion the most persuasive testimony. Although Mr. Friedman valued the Ripon property at $16.7 million when that figure is coupled with the other valuations for the remaining properties the value was overstated by $100,000 so the Court has reduced his estimate as to the Ripon property from $16.7 to $16.6 million.

. . . The plaintiff would have this court construe fair market value to an appraiser's opinion based upon comparables, assessed values and a depreciated cost assessment. This Court believes that appraised value can also include both the income approach together with some inherent qualities that would be attributable to a specific buyer. Those type of inherent qualities can include things like proximity in the case of an adjoining owner, access in the case of a land locked parcel and synergies in a case like [United] and its geographical and rail line related enhancements to value.

Ultimately, the circuit court granted Country Visions specific performance to exercise the right of first refusal——giving Country Visions 15 days to exercise the right of first refusal at the $16.6 million exercise price.

¶16 Both Country Visions and Defendants appealed the circuit court's decision on numerous grounds. As relevant to our review, the court of appeals was asked to address "the appropriate price at which the [right of first refusal] was to be exercised." Country Visions, 392 Wis. 2d 672, ¶31. The court of appeals concluded that the circuit court "did not err in considering the unique synergies specific to United in determining an appropriate exercise price under the equitable

12

remedy it adopted." Id., ¶37. However, the court of appeals did not specifically affirm the Ripon Property's $16.6 million valuation because it was unclear from the circuit court's decision whether the $16.6 million valuation included personal property, which the court of appeals determined was excluded from the terms of the right of first refusal contract. Id., ¶38. To remedy this lack of clarity, the court of appeals remanded for the circuit court to "determine what portion of the $25 million previously agreed-upon price is fairly allocable to the real estate alone, had United made a bona fide offer for just that property." Id., ¶43.

¶17 Country Visions petitioned this court seeking to set the exercise price at $7.7 million——the price that Country Visions' expert determined as the "fair market value" of the Ripon Property. Country Visions argued that we should do so because the circuit court violated basic right of first refusal principles when it set the exercise price based on United's willingness to pay more than the appraised value of the Ripon Property. We granted review.

### III. STANDARD OF REVIEW

¶18 This case requires us to determine whether the circuit court properly set the price at which Country Visions could exercise its right of first refusal. This requires us to apply the law to the circuit court's findings of fact.

¶19 "We uphold a circuit court's findings of fact unless they are clearly erroneous." Phelps v. Physicians Ins. Co. of

13

Wis., Inc., 2009 WI 74, ¶34, 319 Wis. 2d 1, 768 N.W.2d 615. "[A] finding of fact is clearly erroneous when 'it is against the great weight and clear preponderance of the evidence.'" Id., ¶39 (quoting State v. Arias, 2008 WI 84, ¶12, 311 Wis. 2d 358, 752 N.W.2d 748). "Therefore, although evidence may have presented competing factual inferences, the circuit court's findings are to be sustained if they do not go 'against the great weight and clear preponderance of the evidence.'" Id. (quoting Arias, 311 Wis. 2d 358, ¶12).

¶20 The application of the circuit court's findings of fact to the law is a question of law. Id., ¶35. "We decide questions of law independently." Id.

## IV. ANALYSIS

¶21 We begin our analysis with a general discussion of rights of first refusal, paying particular attention to the interaction between rights of first refusal and inflated values in package deals. We then apply that law to the facts of this case.

### A. Rights of First Refusal Generally

¶22 "A right of first refusal is a contractual right to be first in line should the opportunity to purchase or lease a property arise." MS Real Est. Holdings, 362 Wis. 2d 258, ¶24. As we have explained, a right of first refusal is

> a right to buy before or ahead of others, thus, a pre-emptive right contract is an agreement containing all the essential elements of a contract, the provisions of which give to the prospective purchaser the right to buy upon specified terms, but, and this is the

14

important point, only if the seller decides to sell. It does not give the pre-emptioner the power to compel an unwilling owner to sell, and therefore is distinguishable from an ordinary option.

Id., ¶25 (quoting Edlin v. Soderstrom, 83 Wis. 2d 58, 68, 264 N.W.2d 275 (1978)). "Where the procedure [for exercising the right] is clear and the time to exercise the right is reasonable, a right of first refusal 'provides a possible buyer who is constantly available.'" Id., ¶28 (quoting Bruns v. Rennebohm Drug Stores, Inc., 151 Wis. 2d 88, 99, 442 N.W.2d 591 (Ct. App. 1989)).

¶23 Thus, if a property owner receives an offer, the owner must offer the property to the right holder first in compliance with the right of first refusal contract terms.[10] If the right holder accepts the property owner's offer, the right holder purchases the property. If the right holder declines the property owner's offer, the property owner may then accept the prospective buyer's offer. Accordingly, "[t]he holder of a right of first refusal cannot force landowners to sell or lease their property unless they freely choose to do so. Even then,

---

[10] We note that generally, right of first refusal contracts provide that the right holder must purchase the property at the same purchase price with the same terms and conditions as the prospective buyer. See, e.g., MS Real Est. Holdings, LLC v. Donald P. Fox Fam. Tr., 2015 WI 49, ¶6, 362 Wis. 2d 258, 864 N.W.2d 83. As is the case with every contract, the parties to a right of first refusal contract can set the terms of the contract, including setting a fixed exercise price or setting the methodology——such as "objective pricing by way of appraisal or market index"——for calculating the exercise price. See David I. Walker, Rethinking Rights of First Refusal, 5 Stan. J.L. Bus. & Fin. 1, 37-38 (1999).

15

landowners may condition such sale or lease on terms that are acceptable to them." Id., ¶29.

¶24 These basic principles of rights of first refusal become more complicated when the burdened property is sold as part of a package deal with other real or personal property that is not subject to the right of first refusal. In addressing package deals and rights of first refusal, jurisdictions across the nation have adopted varying approaches.[11]

¶25 In Wisconsin, the court of appeals addressed this problem of package deals and rights of first refusal for the first time in Wilber Lime Products, Inc. v. Ahrndt, 2003 WI App 259, 268 Wis. 2d 650, 673 N.W.2d 339. In Wilber Lime, the court of appeals addressed facts similar to those now before us. There, the property owner sold 180 acres, of which Wilber Lime held a right of first refusal to 25 of the acres. Id., ¶¶2-3. To resolve the case, the court of appeals had to determine how a court should address a right of first refusal when a property

---

[11] Some jurisdictions hold that the selling of a burdened property as part of a larger package deal does not trigger the right of first refusal but enjoins the sale of the burdened property as part of a package deal. See Bernard Daskal, Rights of First Refusal and the Package Deal, 22 Fordham Urb. L.J. 461, 475-79 (1995). Other jurisdictions hold that the selling of a burdened property as part of a package deal does trigger the right of first refusal. See id. at 480. These jurisdictions that hold that the right of first refusal is triggered disagree as to the remedy: one jurisdiction opting for contract damages; another jurisdiction opting for specific performance on the entire package deal; and the majority of jurisdictions opting for specific performance on the burdened property alone. See id. at 480-84.

16

that is subject to that right of first refusal is sold as part of a package deal. Id., ¶8. After surveying how different jurisdictions addressed such a case, the court of appeals settled on the "middle road" approach the Fourth Circuit Court of Appeals set forth in Pantry Pride Enterprises v. Stop & Shop Cos., 806 F.2d 1227, 1230 (4th Cir. 1986). Explaining the Fourth Circuit's conclusions, our court of appeals stated the following:

> [T]he [Fourth Circuit] concluded that the right of first refusal was triggered and that awarding specific performance was consistent with the parties' intent when they agreed to the right of first refusal. [Pantry Pride, 806 F.2d at 1230]. However, the court did not think that a simple pro rata valuation was fair. Instead, the court remanded the case for an allocation of the fair market value of the property burdened by the right of first refusal. Id. at 1231. "Permitting the exercise of the first refusal right [based on the purchase price of the whole] provides [the holder of the right] a windfall for which it never bargained in the lease." Id. It would bear "no relation to its worth" and the holder of the right of first refusal would "have acquired [the property] at an absurdly low price and on terms never really agreed to between [the parties]." Id.

Wilber Lime, 268 Wis. 2d 650, ¶11. Relying on Pantry Pride's logic, our court of appeals held that the sale of a property subject to a right of first refusal as part of a package deal triggers the right of first refusal to the burdened property and that the right holder is entitled to specific performance for the sale of the burdened property. Id., ¶12.

¶26 The court of appeals went on to recognize "like the court in Pantry Pride, [there is] the possibility that the acres

17

being sold are not all of equal value." Id., ¶13. The court of appeals then concluded:

> [T]he most equitable resolution is to determine the fair market value of the twenty-five acres. This protects the landowner from being forced to sell the twenty-five acres at a price lower than its fair market value and therefore lower than the owner would accept if the twenty-five acres were sold alone. It also prevents [right holder] from receiving a windfall of being able to purchase the land at a price lower than its value. This approach best fulfills the intentions of the parties when they entered into the agreement granting [right holder] the right of first refusal.

Id.

¶27 This very passage is the basis of Country Visions' argument that the circuit court did not apply a proper methodology in determining the exercise price for the Ripon Property. Country Visions argues that the exercise price for the Ripon Property must be set at the "fair market value," as determined using the three-tiered methodology of appraisals set forth in Wis. Stat. § 70.32(1) (2019-20).[12] This hierarchical

---

[12] All subsequent references to the Wisconsin Statutes are to the 2019-20 version unless otherwise indicated.

"Tier 1" of this three-tiered methodology requires the appraiser to examine a "recent arm's-length sale" of the subject property. Metro. Assocs. v. City of Milwaukee, 2018 WI 4, ¶32, 379 Wis. 2d 141, 905 N.W.2d 784. "If there is no recent sale of the subject property, the appraiser moves to tier 2, examining recent, arm's-length sales of reasonably comparable properties (the 'sales comparison approach')." Id., ¶33. "When both tier 1 and tier 2 are unavailable, an assessor moves to tier 3." Id., ¶34. For tier 3, an assessor:

> may consider all the factors collectively which have a bearing on value of the property in order to determine its fair market value. These factors include cost,

18

methodology is applicable in cases involving taxation and eminent domain, where the need for uniform application is essential. See Wis. Stat. § 70.32(1); Metro. Assocs. v. City of Milwaukee, 2018 WI 4, ¶31, 379 Wis. 2d 141, 905 N.W.2d 784 (applying the methodology to taxation cases); Adams Outdoor Advert., Ltd. v. City of Madison, 2006 WI 104, ¶47, 294 Wis. 2d 441, 717 N.W.2d 803 (same to eminent domain cases); State ex rel. Levine v. Bd. of Rev. of Vill. of Fox Point, 191 Wis. 2d 363, 372, 528 N.W.2d 424 (1995) (explaining that § 70.32(1) "seeks to ensure a uniform method of taxation by requiring assessors to assess real estate at its fair market value, using the 'best information' that the assessor can practicably obtain"). However, the goal of the circuit court when setting the exercise price for a right of first refusal is not to determine the fair market value of the burdened property. Rather, the circuit court must determine the actual price that the prospective third-party buyer would have offered for the burdened property, based on the terms of the contract and facts of the case (we will refer to this actual price as the

---

depreciation, replacement value, income, industrial conditions, location and occupancy, sales of like property, book value, amount of insurance carried, value asserted in a prospectus and appraisals produced by the owner. Both the income approach, which seeks to capture the amount of income the property will generate over its useful life, and the cost approach, which seeks to measure the cost to replace the property, fit under the umbrella of tier 3 analysis.

Id. (cleaned up).

19

"prospective offer price"). See Wilber Lime, 268 Wis. 2d 650, ¶13 ("This approach best fulfills the intentions of the parties when they entered into the agreement . . . ."). This prospective offer price, contrary to Country Visions' argument, need not equal the appraised value nor the fair market value. See Pantry Pride, 806 F.2d at 1231-32; In re Adelphia Commc'ns Corp., 368 B.R. 348, 357-58 (Bankr. S.D.N.Y. 2007). As the court in Adelphia explained,

> The price paid by [the prospective third-party buyer] apparently exceeded fair market value, but it was their right to pay greater than market value. The valuation expert for the [right holder] conceded as much. It makes no difference that the [property] might be worth more to [the prospective third-party buyer] than to other potential buyers because of synergies and economies of scale that [the prospective third-party buyer] could bring to bear. It appears that [the prospective third-party buyer] was willing to pay more for the [property] than other potential offerors would have paid. But that is exactly why one could not simply rely on what the "fair market value" of the [property] might be to those other potential buyers. It is the offer made by [the prospective third-party buyer] that must be matched by the [right holder].

Adelphia, 368 B.R. at 357-58. Indeed, the prospective offer price may be significantly higher than either the appraised value or the fair market value of the burdened property. A prospective buyer may be willing to pay significantly more than the appraised value because the property gives the prospective

buyer greater utility than a different buyer.[13] This is perhaps even more true when a potential buyer is purchasing the burdened property in a package deal where the value of the burdened property increases for the potential buyer because of synergies or relationships between the properties that are a part of the package deal. See, e.g., Adelphia, 368 B.R. at 357 ("It makes no difference that the Consortium Systems might be worth more to Time Warner than to other potential buyers because of the synergies and economies of scale that Time Warner could bring to bear."); In re Albion Disposal, Inc., 152 B.R. 794, 802 (Bankr. W.D.N.Y. 1993) ("The value of the OSL land if sold alone is far less than the value of the OSL lands if combined with the Smith lands in a 'package deal.'" (footnote omitted)); see also It's My Party, Inc. v. Live Nation, Inc., 811 F.3d 676, 688 (4th Cir. 2016) ("The real loss would be the productive synergies created when sellers package complementary products."). Consequently, we reject Country Visions' contention that the prospective offer price must equal the appraised or fair market value.[14]

---

[13] See, e.g., Ben Krumholz, Packers' Development Potential Moves Across Lombardi Ave with Funeral Home Site Purchase, Fox 11 News (July 1, 2020), https://fox11online.com/news/local/green-bay/packers-development-potential-moves-across-lombardi-ave-with-funeral-home-site-purchase (explaining that the Green Bay Packers paid three times the assessed value for two parcels to support its Titletown District development).

[14] To the extent that Wilber Lime says that the circuit court in that case was to determine the fair market value on remand, we interpret that as requiring the circuit court to determine the prospective offer price.

¶28 This general discussion of rights of first refusal and package deals elucidates certain key principles that are applicable to the case before us. First, the sale of a property that is subject to a right of first refusal as part of a package deal triggers the right of first refusal. Wilber Lime, 268 Wis. 2d 650, ¶12. Second, a circuit court must break up the package deal and allow a right of first refusal holder to exercise that right on only the burdened property. Id. Third, the circuit court must look to the contract to determine how to calculate the exercise price for the right of first refusal. MS Real Estate, 362 Wis. 2d 258, ¶¶24-29. Fourth, if the right of first refusal contract provides that the right holder must match the purchase price and terms and conditions of the prospective buyer's offer, as is generally the case, the court must determine the prospective offer price——the actual price that the prospective third-party buyer would have offered for the burdened property based on the terms of the contract and facts of the case. See Wilber Lime, 268 Wis. 2d 650, ¶13; Pantry Pride, 806 F.2d at 1231-32; Adelphia, 368 B.R. at 357-58. Finally, the circuit court may grant specific performance to the right holder to exercise the right of first refusal to purchase the burdened property at the exercise price. See Wilber Lime, 268 Wis. 2d 650, ¶13.

## B. Application

¶29 With these principles in mind, we turn to the facts of the dispute between Country Visions and Defendants. The right of first refusal contract between Country Visions and ADM was a

22

typical right of first refusal contract, providing that Country Visions has the right to purchase the Ripon Property at the "purchase price and other terms and conditions" that a third party offered.

¶30 When ADM and United entered an agreement to sell the Ripon Property, the offer triggered Country Visions' right of first refusal. The circuit court found that "the $20 million offer was a sham at an arbitrarily inflated price" and, instead, used the $25 million package deal price to determine an accurate exercise price.

¶31 The circuit court then set the exercise price at $16.6 million and granted to Country Visions specific performance. Country Visions argues that this number is far greater than the appraised value of the property——$7.7 million——meaning we should replace the circuit court's exercise price of $16.6 million with the appraised value. As we described above, a prospective buyer may choose to offer significantly more than the appraised value of a property, especially in the context of a package deal. This case typifies such a transaction. The circuit court found that the "synergies in a case like [United] and its geographical and rail line [serve as] enhancements to value." Because of these unique synergies that the Ripon Property provided to United, the circuit court determined that the prospective offer price that United offered for the Ripon Property was $16.6 million. Accordingly, we reject Country Visions' request to set the exercise price in this case at the $7.7 million amount that its expert determined was the appraised value of the Ripon

23

Property.[15] Furthermore, we conclude that the circuit court did not err in considering the unique synergies that the Ripon Property provides to United when it set the exercise price higher than the appraised value.

¶32 However, while the circuit court did not err in how it reached its conclusion, it is unclear in the circuit court's decision whether the court correctly valued only the portion of the package deal that was subject to the right of first refusal. This lack of clarity arises because the circuit court used the package deal to set the exercise price, and that package deal included the land, improvements, and personal property of each of the four facilities. Country Visions' right of first refusal was for the real property at the Ripon Property only. Consequently, the package deal should be broken up, removing the other three facilities and all personal property, and Country Visions should be permitted to exercise its right of first refusal on only the real property at the Ripon Property. See Wilber Lime, 268 Wis. 2d 650, ¶12. While it is clear that the circuit court removed the other three facilities, it is unclear from the record whether the circuit court removed the personal

---

[15] This case involved sophisticated commercial actors. If Country Visions had wished for the right of first refusal contract to require that the exercise price be set at the appraised value of the Ripon Property, it could have contracted to do so. See Walker, supra note 10, at 37-38 (explaining the different methods a right of first refusal can set the exercise price).

property when it determined that the actual value of the Ripon Property was $16.6 million.

¶33 Accordingly, we conclude that remand is necessary to determine whether the $16.6 million exercise price included more property than what the right of first refusal contract covers. On remand, the circuit court should create a record such that the exercise price is comprised of the real property at the Ripon Property only. Finally, the circuit court may then grant specific performance to Country Visions at that exercise price. We leave to the circuit court's discretion how best to accomplish these directions on remand.

## V. CONCLUSION

¶34 We conclude that the circuit court did not err in considering the unique synergies that the Ripon Property provides to United when it set the exercise price higher than the appraised value. For rights of first refusal, a prospective buyer may choose to offer significantly more than the appraised value of a property, especially in the context of a package deal. Thus, depending on the terms of the right of first refusal contract and the facts of the case, a circuit court may set an exercise price that exceeds the appraised value of the burdened property. However, we conclude that remand is necessary to determine whether the $16.6 million exercise price includes more than is called for in the right of first refusal contract. Accordingly, we affirm the court of appeals' decision

and remand to the circuit court for proceedings consistent with this opinion.

*By the Court.*—The decision of the court of appeals is affirmed.

¶35 PATIENCE DRAKE ROGGENSACK, C.J. *(concurring)*. We review a right of first refusal (ROFR) that is held by Country Visions Cooperative. The ROFR burdens the Ripon Property, which was owned by Archer-Daniels-Midland (ADM). The Ripon Property was part of a package sale to United Cooperative that also included three other properties, Oshkosh, Auroraville and Westfield, all of which were owned by ADM.

¶36 We are asked to determine whether the price for the Ripon Property under the ROFR is controlled by an appraisal purporting to define the Ripon Property's fair market value or whether the price is affected by the price that United assigned to the Ripon Property in its package offer. I conclude that the ROFR's terms, which do not mention fair market value, control. The ROFR grants a right to purchase by matching "the purchase price and other terms and conditions of such proposed sale" made by a bona fide purchaser in a written offer.[1] Therefore, the terms Country Visions must match, i.e., the exercise price, in order to purchase the Ripon Property are United's terms if they comprise a bona fide offer. However, an opinion on the fair market value of the Ripon Property may provide some guidance about whether the price United alleges that it paid for the Ripon Property in its package purchase was bona fide or an artificial price created to defeat Country Visions' purchase under the ROFR. In re Adelphia Commc'ns Corp., 368 B.R. 348, 356-57 (Bnkr. S.D.N.Y. 2007) (explaining that when the offeror

---

[1] R. 826:2.

and the seller have set a good faith price for an asset sold as part of a group, that price should control).

¶37 The majority opinion concludes that the $16.6 million exercise price for the Ripon Property that was set by the circuit court should be reviewed to determine whether it included personal property that was sold with the real estate under the Asset Purchase Agreement (APA).[2] For the reasons set forth below, I agree and therefore, I respectfully concur and join the majority opinion.

I. BACKGROUND

¶38 The majority opinion capably sets out the background underlying this controversy. Therefore, I describe here only that which is necessary to understand my writing below.

¶39 Country Visions brought this lawsuit to enforce its ROFR to purchase the Ripon Property that ADM sold to United as part of a $25 million package sale of four properties, which included both real estate and personal property.[3] The circuit court held a lengthy bench trial.[4]

---

[2] Majority op., ¶6.

[3] Although the Ripon Property was subject to an allegedly separate offer to purchase for $20 million, with the remaining three properties selling for $5 million, the sales were inter-dependent. As counsel for United said, "We need to be sure they are tied. I know there must be a bit of a trust factor but we need to do the 2 together." On review, there is no real challenge to the Ripon Property being part of a package sale.

[4] Circuit Court Judge Gary R. Sharpe of Fond du Lac County did outstanding judicial work in addressing the many, many factual and legal issues presented by this very complicated case.

¶40 The circuit court found that United had valued the property it purchased from ADM in various ways. For example, United and ADM allocated the $25 million purchase price as $14 million for personal property, leaving $11 million for all four parcels of real estate.[5] United's executive, David Cramer, assigned $20 million of the purchase price to the Ripon Property.[6] And, United booked the cost of the Ripon Property at $8.725 million.[7]

¶41 Country Visions and United provided experts to opine on the actual price for the Ripon Property's part of the $25 million package sale. Country Visions presented Mark Akers who appraised the property as having a fair market value of $7.5 million.[8] The circuit court found that his approach to valuation was "insufficient in determining value in a sale to United."[9]

¶42 The circuit court found that United "intended to use and does use [the Racine Property] to store and ship grain and does and can implement 100 car trains that increase profitability."[10] The court also found that the Ripon Property

---

[5] Findings of Fact, ¶8. Some of the "Findings of Fact" actually are conclusions of law, and some of the listings after the heading "Conclusions of Law" are findings of fact. However, to assist a reader who is referring to the record, I use the labels of the circuit court.

[6] Id., ¶14.

[7] Id., ¶22.

[8] Id., ¶23.

[9] Id., ¶25.

[10] Id.

3

had "synergies with United's other facilities and with the ability to load 100 car trains."[11]

¶43 United presented testimony from Jack Friedman, who opined that the Ripon Property had a value of $16.7 million to United. Due to what the circuit court characterized as a math error, the court concluded that the Ripon Property accounted for $16.6 million of the $25 million United paid to ADM based on Mr. Friedman's testimony.[12]

¶44 The circuit court also made a number of "Conclusions of Law," most of which we were not asked to review. One conclusion for which we accepted review is whether "the fair value for United Cooperative to use in purchasing the subject parcel was the $16.6 million dollars testified to by [] Jack Friedman."[13] The circuit court concluded that Country Visions was entitled to specific performance against United at the exercise price of $16.6 million.[14]

¶45 The court of appeals concluded that the ROFR required a bona fide offer, but not necessarily an offer based on the fair market value derived through the three tiered methodology employed in taxation and eminent domain valuations. Country Visions Coop. v. Archer-Daniels-Midland Co. and United Coop., 2020 WI App 32, ¶33, 392 Wis. 2d 672, 946 N.W.2d 169. The court

---

[11] Id.

[12] Id., ¶26.

[13] Conclusions of Law, ¶5.

[14] Id., ¶10.

4

reasoned that because County Visions' right to purchase arose under a ROFR, courts are "more interested in discerning the most likely arms-length purchase price pertaining to this buyer." Id., ¶34 (emphasis in original). The court of appeals was concerned with whether the circuit court's $16.6 million exercise price included the "business assets [] set forth in the APA" because "nowhere does it appear that Friedman——and by extension the trial court——took into account the value of the personal property at all." Id., ¶¶39, 40 (emphasis in original).

## II. DISCUSSION

### A. Standard of Review

¶46 On review, we affirm the circuit court's findings of fact unless they are clearly erroneous. Phelps v. Physicians Ins. Co. of Wis., Inc., 2009 WI 74, ¶34, 319 Wis. 2d 1, 768 N.W.2d 615. In the case before us, once the historic facts are determined we compare them to the requirements of the ROFR. This presents a question of law that we independently decide, while benefitting from discussions in previous court decisions. Id., ¶35.

B. ROFR General Principles

¶47 It has been said that a ROFR is "simply a fancy name for a small bundle of contract terms." Walker, David I., Rethinking Rights of First Refusal, 5 Stan. J.L. Bus. & Fin. 1, 5 (1999). As we have explained, a ROFR creates contractual rights, the terms for which are stated in the document granting the rights. Edlin v. Soderstrom, 83 Wis. 2d 58, 68, 264 N.W.2d 275 (1978) (noting that such a contract may give a prospective purchaser the right to buy if the seller decides to sell). A ROFR also imposes a duty on the owner of such property to offer to the holder of the ROFR the opportunity to purchase at terms another has offered, which terms the owner is willing to accept. Wilber Lime Prods., Inc. v. Ahrndt, 2003 WI App 259, ¶8, 268 Wis. 2d 650, 673 N.W.2d 339.

¶48 When a ROFR burdens property that the owner has chosen to sell together with other properties, sorting out the exercise price for the property to which the ROFR applies can be complicated. This is especially so when the ROFR contains no yardstick, such as appraised value or fair market value, by which to measure the terms of an offer that the owner says it is willing to accept for an entire package. Daskal, Bernard, Rights of First Refusal and the Package Deal, 22 Fordham Urb. L.J., 461, 465 (1995) (explaining that where no criteria are stated for the exercise of the ROFR, the third party's terms provide relevant criteria). However, "allocations of price to elements of a package may readily be manipulated to defeat contractual rights of first refusal." Pantry Pride Enters.,

6

Inc. v. Stop & Shop Cos., Inc., 806 F.2d 1227, 1231-32 (4th Cir. 1986) (emphasis in original).

¶49 Courts have examined various methods by which to value the exercise price for ROFRs that burden one property in a package sale. As with general contract interpretation principles, some courts attempt to determine the intent of the parties to the ROFR. See Gleason v. Norwest Mortg., Inc., 243 F.3d 130, 142 (3d Cir. 2001) (reviewing prior dealings between the parties). Some courts have held that in the absence of bad faith or another basis for a change in the allocated price, proportionate pricing controls. See Adelphia Commc'ns, 368 B.R. at 356-58. Other courts have said that when the ROFR contains price terms, the owner must honor those terms if it wished to sell. See Foster v. Bullard, 554 S.W.2d 66, 67 (Tex. Civ. App. 1977).

### C. Country Visions' ROFR

¶50 Country Visions' ROFR is set out in a document recorded at the Fond du Lac Register of Deeds. It states in relevant part:

> [T]he Grantor has agreed to grant to the Grantee a right of first refusal to purchase the Property but only upon the terms and conditions set forth herein. . . . For a period of ten (10) years from the date hereof (the "ROF Period"), the Grantor hereby grants to the Grantee a right of first refusal to purchase the Property or applicable portion thereof . . . .
>
> If at any time during the ROF Period, the Grantor desires to sell any part of the Property . . . pursuant to a bona fide written offer from a third party (the "Third Party Offer"), the Grantor shall first notify the Grantee of the

7

> Grantor's desire to sell . . . . The Grantee shall have the right and option to purchase the Offered Property on the Third Party Terms but only if the Grantee shall provide written notice of such election to the Grantor within fifteen (15) days after the Grantee's receipt of the Notice.[15]

As with any written document under which a party is asserting rights, we begin with the terms of the document. Solowicz v. Forward Geneva Nat.l, LLC, 2010 WI 20, ¶13, 323 Wis. 2d 556, 780 N.W.2d 111. Having reviewed the entire ROFR, the dispositive provisions of which are set forth above, I conclude that there is nothing in the ROFR that provides any type of measurement by which to gage whether the price at which United asserts it purchased the Ripon Property is the actual price or whether it is a price manipulated to defeat Country Visions' contractual rights.

¶51 In addition, Wisconsin has had limited appellate cases that address property subject to a ROFR that is being sold with other properties for a package price. Wilber Lime did so. It arose in the context of the sale of a 180-acre farm in which 25 acres were subject to a ROFR. Wilber Lime, 268 Wis. 2d 650, ¶1. The court of appeals was concerned that determining the exercise price for the 25 acres by dividing the purchase price by 180 and then multiplying the quotient by 25 assumed that each acre had the same value when that may not be true. Id., ¶11. Therefore, the court rejected proportionate pricing that other courts have used. See Adelphia Commc'ns, 368 B.R. at 356-58.

---

[15] R. 826:2.

8

¶52 As it structured how the actual price for the 25 acres should be determined, the court concluded that it was equitable "to determine the fair market value" of the twenty-five acres that were subject to the ROFR. Wilber Lime, 268 Wis. 2d 650, ¶13. Wilber Lime explained that the fair market value "protects the landowner from being forced to sell the twenty-five acres at a price lower than its fair market value and . . . [i]t also prevents Wilber Lime from receiving a windfall of being able to purchase the land at a price lower than its value." Id.

¶53 Although Wilber Lime's directive to determine the fair market value of the 25 acres subject to the ROFR is an equitable solution given the context in which the court's decision was made, it has very limited, if any, relevance to the commercial package sale of which the Ripon Property was a part. This is so because of the very different contexts in which Wilber Lime and Country Visions arise.

¶54 For example, in Wilber Lime, the court sought to determine an equitable exercise price for 25 acres of farmland that was part of a 180-acre farmland purchase. In the case before us, four commercial properties were purchased as part of a package. All have revenue generating potentials, but those potentials vary considerably. Some are on a rail line and some are not; some were in good repair and some were not. In addition, United's purchase of the four properties gives it control of grain storage and shipping in an area west of Lake Winnebago in which United had been only a participant prior to

the purchase. This control factor likely affected the price United was willing to pay.

¶55 Furthermore, it is without question that United purchased the Ripon Property to generate revenue.[16] There is nothing in Wilber Lime that indicates that revenue generation was part of the motivation for the purchase of 25 acres. Because the ROFR grants Country Visions the right to match the purchase price and other terms and conditions that United actually paid, but grants no right to a cap or ceiling price set by the fair market value, I conclude that it is United's actual price paid for the Ripon Property that controls Country Visions exercise price.

¶56 On remand, the central question is whether United's expert included personal property acquired under the APA when he asserted that the actual price for the Ripon Property was $16.6 million. This question can be addressed on remand in at least two ways.

¶57 First, personal property belonging to all four parcels of real estate should be identified and valued. The exercise

---

[16] Friedman discussed EBITDA (Earnings Before Interest Taxes Depreciation and Amortization), which is gross revenue achieved before paying the costs of doing business, in the context of evaluating the potential purchase of property. R.630:155-57. EBITDA is a metric used in measuring strength of performance for an on-going business. Hon. Christopher S. Sontchi, Valuation Methodologies: A Judge's View, 20 Am. Bankr. Inst. L. Rev. 1, 11 (2012). EBITDA differs significantly from the NOI (Net Operating Income), another metric used to measure the strength of a business. The NOI focuses on the income generated by a business after the costs of doing business have been addressed. Regency W. Apartments LLC v. City of Racine, 2016 WI 99, ¶9, 372 Wis. 2d 282, 888 N.W.2d 611.

price for the Ripon Property cannot include personal property because the ROFR affords Country Visions no right or obligation to purchase personal property. Pantry Pride, 806 F.2d at 1229.

¶58 Second, Friedman testified to both the value of the Ripon Property as a standalone parcel (the value without "taking into consideration any synergies from anything around it")[17] and its value to United. Both values must be carefully reviewed.

¶59 It was Friedman's opinion that "the Ripon Property has high strategic value to United because it is centrally located within United's grain facility network and located on the same rail line as three of United's other large rail-loading facilities."[18] He used two valuation methods for the Ripon Property.

¶60 In part of his trial testimony, he started his valuation with the $25 million package purchase price. He then deducted $500,000 for the value of Westfield and $2,000,000 for Auroraville.[19] This left $22,500,000 to be divided between Oshkosh and Ripon. He said that he divided that number based on the percentage of the total volume handled by these two properties, with 26% ($5,850,000) attributed to Oshkosh and 74% ($16,650,000) attributed to Ripon.[20] However, in his written report he attributed "52% of the total volume handled in the

---

[17] R. 630:155.

[18] R. 773:12, Expert Report of Jack Friedman.

[19] R. 630:163-65.

[20] R. 630:166.

11

last full year that ADM owned those facilities" to Ripon.[21] He did not mention personal property that also was purchased under the APA.[22]

¶61 Friedman also calculated a stand alone value for the Ripon Property by using 16 cents EBITDA-per bushel times the 5.2 million bushel capacity of Ripon, which results in an annual EBITDA of $832,000. He then multiplied the annual EBITDA by 10, yielding a standalone value for the Ripon Property of $8.3 million.[23] This valuation is based solely on the revenue generating potential of the Ripon Property and Friedman's opinion that a multiple of 10 is reasonable for a grain business such as the Ripon Property.

¶62 Friedman also opined that United achieved a 6 to 10 cent per bushel "margin gain" by using rail shipping with 100-car trains. This is in addition to the usual per bushel revenue generation.[24] Therefore, if Friedman had stayed with the $832,000 annual EBITDA he calculated for the Ripon Property and added a 6 to 10 cent per bushel margin gain onto Ripon's volume

---

[21] R. 773:19.

[22] If 52% of the $25,000,000 package price were assigned to the Ripon Property, Ripon would have a value of $13,000,000, and if 52% were applied to what remained of the package price after Friedman's deductions for Westfield and Auroraville, Ripon would have a value of $11,700,000. Simply stated, Friedman is a skillful witness and his opinion that $16.6 million is the actual price United paid for the Ripon Property is based on his choice of percentages that he applied to the package purchase price.

[23] R. 630:155-57.

[24] R. 630:141.

12

of 5,200,000, the adjusted annual EBITDA that includes the margin gain would be $1,144,000[25] to 1,352,000.[26] If those adjusted annual EBITDAs for the Ripon Property are then multiplied by 10, the multiple Friedman testified was used in assessing potential grain business purchases, the actual price for the Ripon property would be between $11,440,000 and $13,520,000.

¶63 Friedman was asked similar questions on cross-examination that related to United doing only twelve 100-car trains in 2016.[27] He was asked, based on United's actual 2016 production, if margin gains of 2.83 to 4.8 and were added to Ripon's standalone value of $8.3 million, the range of prices for Ripon would be between $11.13 million and $13.1 million.[28]

¶64 Friedman agreed with opposing counsel's valuation if actual 2016 performance were used.[29] However, Friedman objected to the valuation because United had plans to move 22 million bushels of grain each year, which he believed it could accomplish.[30]

---

[25] 5,200,000 x .06 = 312,000 + $832,000 = $1,144,000.

[26] 5,200,000 x .10 = 520,000 + 832,000 = $1,352,000.

[27] R. 630:211-215.

[28] The above two examples are based on revenue production. Therefore, they may have value to the circuit court when this matter is remanded to determine whether personal property was included in the $16.6 million price that the circuit court found as the price United paid for the Ripon Property.

[29] R. 630:215.

[30] There are approximately 400,000 bushels of grain in a 100-car train. R. 773:12. Therefore, to ship 22 million

13

¶65 I agree with the majority opinion that on remand additional briefing or testimony may be necessary.[31]

### III. CONCLUSION

¶66 The majority opinion and the court of appeals both concluded that the $16.6 million exercise price for the Ripon Property that was set by the circuit court should be reviewed to determine whether it included personal property that was sold with the real estate under the APA. For the reasons set forth above, I agree and therefore, I respectfully concur and join the majority opinion.

---

bushels of grain each year, United would have to ship 55, 100-car trains per year, rather than the 12 it shipped in 2016.

[31] Majority op., ¶33.